STATE of Wisconsin, Plaintiff-Respondent,

v.

Matthew R. STEFFES, Defendant-Appellant.†

Court of Appeals

*No. 2011AP691–CR. Submitted on briefs February 6, 2012.
—Decided March 13, 2012.*

2012 WI App 47

(Also reported in 812 N.W.2d 529.)

† Petition for Review Filed.

576

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Jeffrey W. Jensen* of the *Law Offices of Jeffrey W. Jensen*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Daniel J. O'Brien, assistant attorney general*.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. Matthew R. Steffes appeals the judgment convicting him of two counts of conspiracy to commit theft by fraud, contrary to WIS. STAT. §§ 939.31, 943.20(1)(d), and 939.62 (2009–10).[1] He also appeals the order denying his postconviction motion. Steffes argues: (1) the evidence was insufficient to convict him of conspiracy to commit theft of property by fraud; (2) the evidence was insufficient to prove that the

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

579

conspiracy members stole more than $2500 worth of electricity; therefore, the offense was not a felony; (3) he is entitled to resentencing because the trial court relied upon an improper factor in sentencing him; and (4) he should be granted a new trial on the grounds that the real controversy was not tried because the trial court improperly instructed the jury on the elements of the theft by fraud, and defense counsel was ineffective for failing to object. We reject his arguments and affirm.

## I. BACKGROUND.

¶ 2. A jury found Steffes guilty of two counts of conspiracy to commit theft of property exceeding $10,000 in value by fraud. Steffes—an inmate of the Waupun Correctional Institution—along with fellow inmate Joshua Howard, worked with individuals outside of the prison to operate a "burn-out" telephone scam that allowed Steffes to place over 300 calls from prison without paying for them.

¶ 3. At trial, Rheanan Hoffman, Steffes' sister and the mother of Howard's daughter, and Angela Berger, Hoffman's roommate and the mother of Howard's son, explained how the burn-out scam worked. Hoffman and several others—including Steffes' father and two of Steffes' cousins—contacted the phone company to set up a line or lines of service. Unbeknownst to the telephone company, each phone line was in the name of an individual or business other than the person actually setting up the line. Indeed, some of the phone lines used the names of patients at a healthcare clinic where Berger worked. These fraudulent phone lines were called "burn-out" lines because the individuals setting them up had no intention of ever paying for the phone service. They understood that the phone company would eventually shut the line down because the service was not being paid for—in other words, the line would

eventually "burn out." The burn-out lines in this case were set up to avoid the prison's Correctional Billing Service, which monitors inmate collect calls to the outside and limits the minutes and dollar amount that a prisoner can exhaust on any one phone number by blocking service until someone pays the balance due. By allowing access to numerous lines, so that when one was blocked they could easily access another, the burn-out scheme allowed Steffes and Howard to flout Correctional Billing Service's blocking mechanism.

¶ 4. Division of Corrections and Waupun Correctional Institution Investigative Captain Bruce Muraski explained how the telephone system at Waupun works, how outgoing calls are monitored, and how Corrections Billing Services operates to block the overuse of phone lines. He explained that burn-out phone scams are a cottage industry in prison.

¶ 5. Along with Hoffman's, Berger's, and Muraski's testimony, and the testimony of others involved in the burn-out scam, the State submitted recordings and other documents implicating Steffes. Specifically, the recordings of various calls from the prison, involving both Steffes and other conspirators discussing the burn-out scheme, were played for the jury. For example, in one such call, Steffes gave Hoffman a list of numbers that he suspected would soon be blocked. In another call, Hoffman gave Steffes specific instructions regarding using particular phone numbers, and Steffes asked her to confirm that she would have additional lines "unblocked" for him soon. In yet another call, Steffes instructed another individual regarding how to operate a burn-out line to conduct a three-way call. Additionally, Division of Criminal Investigation Agent Dennis Drazkowski submitted letters written by Howard to Steffes discussing the scheme and instruct-

581

ing Steffes what to do regarding the use of specific burn-out lines.

¶ 6. Steffes benefitted enormously from the scam. From June 1, 2002 until December 31, 2003, he made approximately 322 calls from prison totaling 6,562 minutes on burn-out lines.

¶ 7. The damages too were significant. Robert Lindsley—who managed the group at the phone company that planned, engineered, and installed the electrical system providing power for the equipment used to deliver telephone service to paying customers—testified that the electricity that customers access when using its phone line is worth millions of dollars. Lindsley also explained how use of its telephone network constitutes use of an applied form of electricity. In other words, an electric power network supports the telecommunications network set up by the company. That network supplies electricity to run the telephone network. Thus, when a customer uses the telephone network, he or she is using an applied form of electricity. Additionally, Eric Stevens, an investigator in the phone company's asset protection department, estimated the fair market value to the telephone company of the service fraudulently obtained for each of those lines. Those figures represented the lost fair market value of the service due to non-payment of bills by the co-conspirators, from the date of installation to the date of disconnection of each line. For example, the total amount unpaid for the fictitious "Nick's Heating and Cooling," "Douyette Advertising Service" and "Douyette Typing Service" that were set up under the Steffes/Howard burn-out scheme exceeded $26,000.

¶ 8. As noted, the jury found Steffes guilty of two counts of conspiracy to commit felony fraud. It found him not guilty of conspiracy to commit identity theft. The trial court sentenced Steffes to fifty-four months'

imprisonment, explaining that the sentence derived in part from disregard for the individuals whose identities were stolen:

> And somehow you didn't even think, as you said, that once again you are harming other people. Why wouldn't that thought come to you that these identities that are being used must come from somewhere? And as we saw through trial, they were people in elderly residential homes, various other people who had done nothing wrong to you, did not deserve harm, and by your choice, you kept up this pattern of not paying attention to the harm suffered by others.

¶ 9. Steffes subsequently filed a motion for post-conviction relief, which the trial court denied. He now appeals.

## II. ANALYSIS.

¶ 10. Steffes makes four arguments on appeal: (1) the evidence was insufficient to convict him of conspiracy to commit theft of property by fraud; (2) the evidence was insufficient to prove that the conspiracy members stole more than $2500 worth of electricity; therefore, the offense was not a felony; (3) he is entitled to resentencing because the trial court relied upon an improper factor in sentencing him; and (4) he should be granted a new trial on the grounds that the real controversy was not tried because the trial court improperly instructed the jury on the elements of the theft by fraud, and defense counsel was ineffective for failing to object. We discuss each argument in turn.

*(1) There was sufficient evidence for the jury to convict Steffes of conspiracy to commit theft of property by fraud.*

¶ 11. Steffes gives two reasons why the evidence was insufficient to convict him of conspiracy. He argues

that the State failed to prove that any member of the conspiracy made "a false promise" to pay for services. According to Steffes, there was no evidence that when any of the conspiracy members applied for telephone services, they were asked to declare his or her intention to pay for the services. Thus, because there was no expressly made false promise, the evidence was insufficient to support the conviction. Additionally, Steffes argues that he was not a part of the conspiracy because the crime was already "complete" by the time he got involved. According to Steffes, the crime was already complete because other people—like Howard and Hoffman—fraudulently obtained the burn-out lines; he simply used them once they had been obtained. Therefore, because Steffes only got involved after the crime was complete, his role was more akin to an accessory after the fact or a recipient of stolen property.

¶ 12. When reviewing whether sufficient evidence supports Steffes' conviction, we may not substitute our judgment for the jury's " 'unless the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.' " *See State v. Watkins*, 2002 WI 101, ¶ 68, 255 Wis. 2d 265, 647 N.W.2d 244 (citation omitted). Under this standard, we may overturn the verdict only if the jury "could not possibly have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt." *See id.* We may not overturn the verdict even if we believe the jury " 'should not have found guilt based on the evidence before it.' " *See id.* (citation omitted).

¶ 13. Steffes was convicted of conspiracy to commit theft of property by fraud, contrary to Wis. Stat.

§§ 939.31 (conspiracy); 943.20(1)(d) (theft of property by fraud); and 939.62 (habitual offender penalty increase).

■■

¶ 14. WISCONSIN STAT. § 939.31 provides: "whoever, with intent that a crime be committed, agrees or combines with another for the purpose of committing that crime may, if one or more of the parties to the conspiracy does an act to effect its object, be fined or imprisoned or both." In other words, "[a] conspiracy is an agreement between two or more persons to accomplish a criminal objective." *State v. Blalock*, 150 Wis. 2d 688, 704, 442 N.W.2d 514 (Ct. App. 1989). The three elements of conspiracy are: (1) intent by the defendant that the crime be committed; (2) agreement between the defendant and at least one other person to commit the crime; and (3) an act performed by one of the conspirators in furtherance of the conspiracy. *State v. Routon*, 2007 WI App 178, ¶ 18, 304 Wis. 2d 480, 736 N.W.2d 530; *see also* WIS JI—CRIMINAL 570; *State v. West*, 214 Wis. 2d 468, 476, 571 N.W.2d 196 (Ct. App. 1997). "The crime that is the subject of the conspiracy need not be committed in order for a violation of [§ 939.31] to occur; rather, the focus is on the intent of the individual defendant." *Routon*, 304 Wis. 2d 480, ¶ 19. This is because conspiracy " 'focuses on the additional dangers inherent in group activity.' " *See State v. Peralta*, 2011 WI App 81, ¶ 21, 334 Wis. 2d 159, 800 N.W.2d 512 (citation and one set of quotation marks omitted). " 'In theory, once an individual reaches an agreement with one or more persons to perform an unlawful act, it becomes more likely that the individual will feel a greater commitment to carry out his original intent, providing a heightened group danger.' " *Id.* (citation and one set of quotation marks omitted).

¶ 15. WISCONSIN STAT. § 943.20(1)(d), (3)(bf)-(c) provide that whoever: "[o]btains title to property of another person by intentionally deceiving the person with a false representation . . . known to be false, made with intent to defraud, and which does defraud the person to whom it is made," in excess of $2500 has committed a felony. " 'False representation' includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme." § 943.20(1)(d).

¶ 16. In Steffes' case, there was ample evidence for the jury to convict him of conspiracy to commit theft of property by fraud. As noted, the State submitted numerous recordings and other documents implicating Steffes. For example, the recordings of various calls from the prison involving Steffes not only discussing the burn-out scheme, but also instructing others on how to conduct the scheme, were played for the jury. Additionally, Agent Drazkowski submitted letters written by Howard to Steffes discussing the scheme and instructing Steffes what to do regarding the use of specific burn-out lines. In total, Steffes made over 300 calls using burn-out phone lines, totaling over 6500 minutes of talk time and, as will be discussed further *infra,* over $26,000 of value in applied electricity. This evidence was sufficient to establish that Steffes: (1) intended to steal and use phone services that did not belong to him via fraudulent means; (2) agreed with "at least one other person to commit the crime;" and (3) performed acts "in furtherance of the conspiracy." *See Routon,* 304 Wis. 2d 480, ¶ 18; WIS JI—CRIMINAL 570; *West,* 214 Wis. 2d at 476.

¶ 17. Moreover, contrary to what Steffes argues, there is no legal requirement under WIS. STAT. § 943.20(1)(d) that at least one of the co-conspirators

expressly promise the phone company that it would pay for the fraudulently obtained phone lines. Steffes' argument that "[t]here was no evidence . . . that when one applies for telephone services, one is asked to declare his or her intention to pay for the services" misses the point. Section 943.20(1)(d) does not require direct evidence of—as Steffes argues—a false promise expressly made. *See id.* Rather, it requires that the offender "intentionally deceiv[e]" the victim "with a false representation . . . known to be false, made with intent to defraud." *See id.* There was plenty of evidence in the record that members of the burn-out scam intentionally deceived the phone company with numerous false representations made with the express purpose to defraud the company. Hoffman herself admitted to using information from other individuals—such as unsuspecting clients of the clinic where Berger worked—to set up false phone accounts, including fake businesses such as "Nick's Heating and Cooling" and "Douyette Typing Service" with the express purpose of being able to use phone services without paying for them. As noted, Steffes both actively participated in and benefitted from these false representations.

¶ 18. Furthermore, contrary to what Steffes argues, there is also no legal requirement that to join the conspiracy, Steffes must have been involved in the burn-out scheme before the first co-conspirator initially contacted the phone company. Steffes argues that he was not a part of the conspiracy because the crime was already "complete" by the time he got involved. However, as the evidence at trial showed, Steffes was more than just someone who received access to a stolen phone line after others had taken the trouble to fraudulently obtain and operate it. He received specific instruction on how to use the line so that nobody—

587

himself included—would get caught. He actively took part in phone calls where perpetuating the scam was discussed. This evidence shows that Steffes was an active participant in many facets of the scheme. There was sufficient evidence to convict him of conspiracy to commit theft by fraud.

*(2) There was sufficient evidence to prove that the conspiracy members stole more than $2500 worth of applied electricity.*

¶ 19. Steffes next argues that, even if the evidence was sufficient to convict him of conspiracy, his conviction must be amended from a felony to a misdemeanor because there was insufficient evidence to prove that more than $2500 of property was stolen. *See* WIS. STAT. § 943.20(3)(bf)-(c) (fraudulently obtaining property valued in excess of $2500 constitutes a felony). He presents several arguments. First, according to Steffes, while the State presented testimony concerning the value of the telephone services that were stolen, telephone services are not property under the statute. *See* WIS. STAT. § 943.20(2)(b) (defining "property" as "all forms of tangible property"). In other words, he argues services are not tangible property. Second, Steffes argues that even if it was not services but tangible property in the form of "applied electricity" that was stolen, there still is insufficient evidence to convict him of a felony because the State's expert, Lindsley, was "utterly unable to testify as to the value of the electricity that was involved in the burn-out accounts." Third, Steffes contends that even if phone services are considered tangible property under the statute, the evidence is still insufficient because "there is no economic loss where a customer fraudulently obtains service." (Emphasis omitted.) According to Steffes, there was no evidence

588

that the phone company lost money or that the calls of paying customers were unable to be completed because of the burn-out lines. The only true loss was a miniscule amount of electricity. Steffes argues, "[e]conomically speaking, [the phone company]'s bottom line would have been no different even if the burn-out phones had never been set up."

¶ 20. As noted, the issue before us is not whether we believe the jury should have found guilt based on the evidence before it, but whether " 'the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt.' " *See Watkins*, 255 Wis. 2d 265, ¶ 68 (citation omitted). As with all statutory analysis, we begin by looking at the language of the statute itself. *See State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110.

¶ 21. Wisconsin Stat. § 943.20(2)(b) defines "property" as: "all forms of tangible property, whether real or personal, without limitation including electricity, gas and documents which represent or embody a chose in action or other intangible rights."

¶ 22. Wisconsin Stat. § 943.20(2)(d) further provides, in pertinent part:

> Except as otherwise provided in this paragraph, "value" means the market value at the time of the theft or the cost to the victim of replacing the property within a reasonable time after the theft, whichever is less. If the property stolen is . . . [an] intangible right, "value" means . . . the market value of the . . . right . . . .[2]

---

2 Wisconsin Stat. § 943.20(2)(d) provides, in full:

¶ 23. Construing the statutory language to give words their ordinary meaning, as we are required to do, *see State v. Tucker*, 2005 WI 46, ¶ 11, 279 Wis. 2d 697, 694 N.W.2d 926, we conclude that the term "electricity" found in Wis. Stat. § 943.20(2)(b) is broad enough to encompass the transmission of electricity over telephone lines. The statute does not specifically distinguish the type of electricity being used, or which utility is providing the electricity. The lack of such specificity convinces us that the legislature intended the term "electricity" to be interpreted broadly, and that electricity used to transmit the human voice via telephone lines falls within the term "electricity" used in § 943.20(2)(b). *See State v. Quintana*, 2008 WI 33, ¶ 32, 308 Wis. 2d 615, 748 N.W.2d 447 ("When the legislature does not use words in a restricted manner, the general terms should be interpreted broadly to give effect to the legislature's intent.").

■■
¶ 24. We further conclude that the market value to the telephone company of the services that the burn-out scam fraudulently obtained is the correct

---

Except as otherwise provided in this paragraph, "value" means the market value at the time of the theft or the cost to the victim of replacing the property within a reasonable time after the theft, whichever is less. If the property stolen is a document evidencing a chose in action or other intangible right, "value" means either the market value of the chose in action or other right or the intrinsic value of the document, whichever is greater. If the property stolen is scrap metal, as defined in s. 134.405(1)(f), "value" also includes any costs that would be incurred in repairing or replacing any property damaged in the theft or removal of the scrap metal. If the thief gave consideration for, or had a legal interest in, the stolen property, the amount of such consideration or value of such interest shall be deducted from the total value of the property.

measure of the value of the stolen property in this case. While Steffes argues that the phone company suffered no economic loss from the burn-out scam, he provides no support for the contention that the value of the stolen electricity ought to be valued this way. *See State v. McMorris*, 2007 WI App 231, ¶ 30, 306 Wis. 2d 79, 742 N.W.2d 322 (The court of appeals "may choose not to consider arguments unsupported by references to legal authority, arguments that do not reflect any legal reasoning, and arguments that lack proper citations to the record."). Indeed, his argument runs contrary to the plain language of the statute, which provides that the measure of value of the stolen property is its fair market value. *See* Wis. Stat. § 943.20(2)(d). The undisputed evidence is that the phone company lost over $26,000 in billable services—*i.e.,* applied electricity—on the fraudulent "Nick's Heating and Cooling," "Douyette Advertising Service" and "Douyette Typing Service" accounts. There was, therefore, sufficient evidence for the jury to rely on in determining that the market value to the phone company for each count of conspiracy under which Steffes was charged exceeded $10,000. *See Watkins*, 255 Wis. 2d 265, ¶ 68; Wis. Stat. § 943.20(3)(bf)-(c).

*(3) Steffes is not entitled to resentencing because the trial court did not rely on an improper factor in sentencing him.*

¶ 25. Steffes also argues that he is entitled to resentencing because the trial court relied on an allegedly improper factor. Specifically, Steffes argues the trial court noted that Steffes was involved in a scheme in which the identities of vulnerable people were stolen, even though Steffes was found not guilty of identity theft. According to Steffes, the trial court should have focused solely on the victim of the crimes of which he

was convicted, in this case, the phone company. Because it did not do so, the trial court based Steffes' sentence on an improper factor.

¶ 26. "A defendant has a constitutionally protected due process right to be sentenced upon accurate information." *State v. Tiepelman*, 2006 WI 66, ¶ 9, 291 Wis. 2d 179, 717 N.W.2d 1. Whether this due process right has been denied is a constitutional issue that we review *de novo. See id.*

¶ 27. In Steffes' case, the trial court did not err by noting that Steffes was involved in a scheme in which the identities of vulnerable people were stolen, even if Steffes was in fact acquitted of the identity theft charge. This is because "[a] sentencing court may consider uncharged and unproven offenses and facts related to offenses for which the defendant has been acquitted." *See State v. Leitner*, 2002 WI 77, ¶ 45, 253 Wis. 2d 449, 646 N.W.2d 341 (footnote omitted). Therefore, Steffes is not entitled to resentencing.

*(4) Steffes is not entitled to a new trial on the ground that the real controversy was not fully tried.*

¶ 28. As a final matter, Steffes argues that the real controversy was not fully tried because the trial court made two errors in instructing the jury. First, the court failed to instruct the jury on the fact that under the theft by fraud statute, a "false representation" can include "a promise made with intent not to perform it." Second, the court instructed the jury that a promise may be express or implied—but, according to Steffes, that is not the law. Steffes also argues that his trial counsel was ineffective for failing to object to these two errors.

¶ 29. We disagree. Steffes provides no record citation pointing us to the trial court's giving the jury instructions at issue. He does not, beyond baldly asserting that "[t]his is simply not the law," explain the legal basis for his contention that a promise must be express, and cannot be implied. As we have already explained, WIS. STAT. § 943.20(1)(d) does not require direct evidence of—as Steffes argues—a false promise expressly made. *See id.* Moreover, Steffes does not explain why trial counsel's decision not to object to the jury instructions was deficient, or why it was prejudicial. *See State v. Mayo*, 2007 WI 78, ¶ 33, 301 Wis. 2d 642, 734 N.W.2d 115 (claim for ineffective assistance of counsel requires defendant to establish that trial counsel's performance was both deficient and prejudicial); *Strickland v. Washington*, 466 U.S. 668, 697 (1984) (if defendant fails to make a sufficient showing on one prong of ineffective assistance of counsel test, we need not address the other). We therefore conclude that Steffes' arguments as to these matters are insufficiently developed, and decline to consider them. *See McMorris*, 306 Wis. 2d 79, ¶ 30.

*By the Court.*—Judgment and order affirmed.