SHIRLEY S. ABRAHAMSON, C.J.
¶ 34. (dissenting). In common parlance, Matthew Steffes, the defendant, and his co-conspirators set up a complicated *706 scheme to steal from the telephone company. They intended to, and did, bilk the telephone company of what the telephone company sells — telephone services.
¶ 35. The defendant is not, however, guilty of a crime unless the State can prove beyond a reasonable doubt that he violated the terms of a specific statute. Why? Because there are no common law crimes in Wisconsin.[1] All crimes are statutorily defined.
¶ 36. The defendant in the present case was charged with, and found guilty of, violating Wis. Stat. §§ 943.20(l)(d)[2] and 943.20(3)(c),[3] a class G felony. These statutes criminalize fraudulently obtaining the property of another with a value in excess of $10,000.
¶ 37. The question of law presented in the instant case is, as the majority opinion states at ¶ 15: "[Wjhether the applied electricity that AT&T uses to power its network is included in the definition of 'property' found in § 943.20(2)(bparlan)." As the major *707 ity opinion explains at ¶¶ 9-10, the telephone company uses electricity to power the transmission of telephone calls.[4]
¶ 38. Electricity is specifically enumerated as "property" subject to the statute.[5] Wisconsin Stat. § 943.20(2)(b) defines the word "property" for purposes of the statute as follows: " 'Property' means all forms of tangible property, whether real or personal, without limitation including electricity, gas and documents which represent or embody a chose in action or other intangible rights."[6]
¶ 39. Services, including telephone services, are not included within the statutory definition of property.[7]
*708 ¶ 40. I write on two issues of law presented: (1) whether stealing telephone services from the telephone company constitutes stealing electricity under the statute at issue; and (2) if so, whether the value of the telephone services equals the value of the electricity stolen under the statute at issue.
¶ 41. The State chose, as is its prerogative, to charge the defendant with violation of the felony statute.[8] I do not agree with the State or the majority opinion that stealing telephone services that apply electricity is stealing electricity within the meaning of Wis. Stat. § 943.20. Even if stealing the telephone services can be shoehorned into the statutory concept of stealing electricity, I do not agree with the majority *709 that, as a matter of law or fact, the value of electricity-stolen is the same as the market value or replacement value of the telephone services stolen. I therefore dissent.
I
¶ 42. I conclude as a matter of statutory interpretation that the defendant did not steal electricity from the telephone company under the statute at issue.
¶ 43. Electricity powers our 21st Century world. We all purchase electricity or use electricity purchased by others to power our lives. The telephone company purchases electricity and provides services that are powered by electricity.
¶ 44. The majority opinion defines electricity: "[I]n its everyday parlance [electricity] means something that provides power" and that "[a] straightforward reading of this statute combined with the use of dictionaries unequivocally supports the State's view that Steffes stole electricity from AT&T." Majority op., ¶¶ 25-26.
¶ 45. The majority opinion seems to rely on two theories to support its interpretation of the statutory word "electricity." First, it asserts that "applied electricity" is included -within the statutory word "electricity." Second, it asserts that the telephone company differs from the typical user of electricity or service provider that powers its services with electricity. Why? Because the telephone company, unlike other users of electricity or service providers, owns the electricity. Majority op., ¶¶ 26, 30.
¶ 46. The majority opinion, the State, and the court of appeals interpret the word "electricity" in the statute to include "applied electricity."
¶ 47. The majority opinion defines the word "electricity," as we stated above, but does not define the phrase "applied electricity." The phrase "applied elec *710 tricity" does not appear in dictionaries or in glossaries discussing electricity.[9] So what is the meaning of the phrase?
¶ 48. At trial, the State presented testimony that telephone services are included in the definition of "property" because telephone service uses an "applied form of electricity." Robert Lindsley, an electrical engineer and manager for the telephone company offered his expert opinion that "when you, you know, use your phone, you are using an applied form of electricity."[10]
¶ 49. In its brief to the court of appeals, the State argued that "[t]he 'property' obtained by the installation and use of the fraud [sic] telephone lines by false representation were [sic] valuable telephone services which involve an 'applied form' of electricity and, as such, is 'property' within the scope of the statute. . . . Those calls simply could not be completed without electricity (unless the co-conspirators used tin cans and miles of string to transmit voice impulses). Electricity is an essential component of telephone service . . . ."[11]
*711 ¶ 50. Interpreting the statutory word "electricity" appearing in Wis. Stat. § 943.20(2)(b), the court of appeals concluded as a matter of law that "electricity" as used in the statute includes "applied electricity," that is, that the statute includes electricity used to transmit the human voice via telephone lines.[12]
¶ 51. In its brief before this court, the State argues that "property" under Wis. Stat. § 943.20(2)(b) includes electricity in its applied form; that "[t]he electricity and the telephone system to which it was applied were inextricably linked," and that "[electricity is an essential component of telephone service . . . ."[13]
¶ 52. Thus, the phrase "applied electricity" simply refers to the application of electricity in some manner. The phrase is used to mean how and when electricity is used to power a particular product or service. The phrase "applied electricity," as used in the majority opinion, means the telephone company applies electricity in the delivery of telephone services. More broadly, "applied electricity" means any application of electricity.
¶ 53. This use of the phrase "applied electricity" is the ordinary use of the phrase. Accordingly, the Cyclopedia of Applied Electricity describes itself as "a complete and practical working treatise on the generation and application of electric power."[14] According to the Cyclopedia: "The applications of the electric current are *712 numberless and are to be found in every home. . . . Think again of the telephone, the wire and wireless telegraphs, and the thousands of other application of the electric spark, and electric energy which contribute to our daily comfort."[15]
¶ 54. Thus, stealing "applied electricity" means in the present case, according to the majority opinion, stealing the electricity used to power the telephone services. Majority op., ¶ 5.
¶ 55. If the criminal statute at issue includes electricity used to power telephone services as property, then the majority opinion has, in effect, rewritten the statute to include numerous services that are powered by electricity.
¶ 56. The State attempts to avoid this result by distinguishing telephone services from other "services [that] involve the use of electricity (i.e., legal advice over a telephone or the barber's use of electric hair clippers)." From the State's vantage point, electricity is incidental to numerous services but, in contrast, integral to the telephone. Employees, skills, time, machin *713 ery, and labor are incidental to telephone services but, in contrast, according to the State, integral to other services that use electricity. The State's brief explains the differences among service providers that use applied electricity as follows:
The obvious difference is that the telephone lines cannot function, and so the service cannot be provided, without an enabling electrical system: electricity is essential to the service. A telephone system cannot exist without it. The customer who purchases access to a phone line purchases the electricity that powers it. Legal services and a haircut can, theoretically, be provided without using electricity (a face-to-face meeting with a lawyer; a barber's scissors or straight razor). The electricity used in connection with those services is only incidental to the service itself. It is the value of the lawyer's skill and time, and the barber's skill and labor, that is lost when those services are fraudulently obtained by the lawyer's client or the barber's customer. The telephone company loses the value of the applied form of electricity when its services are fraudulently obtained; the value of the telephone company's spent employee skills, time and labor are only incidental to that service.[16]
¶ 57. This argument is unpersuasive, and the majority opinion rightfully refuses to adopt it.
¶ 58. Service providers other than the telephone company require electricity to operate. For example, the dentist uses electricity to power the lights, the dental chair, the drill, the electric toothbrush, the suction apparatus, the ultrasonic sterilizer, the sealant gun, the x-ray machine, the security system, and computers. Even the old-school barber, with only her scissors and straight razor, needs lights to see what she is doing. As I recently discovered, when the electricity is shut off for a few hours, the barber closes up shop.
*714 ¶ 59. Without electricity, neither the telephone company nor the dentist nor the barber can operate. Electricity is essential and integral to telephone and dental and barbering services and telephone and dental and barbering services all also require human skills, time, labor, and equipment.
¶ 60. In lieu of the State's argument that "electricity is integral to telephone services," the majority opinion distinguishes telephone services using "applied electricity" from other services using "applied electricity" based on the notion that the telephone company owns the electricity that powers the telephone services. Robert Lindsley explained that the telephone company purchases AC power from the commercial utility, converts the electricity into DC power, and stores that energy in batteries so that in the event of a power outage, the telephone company can use the energy from the batteries to power the telephone system.[17]
¶ 61. The majority opinion promotes the "ownership" distinction as follows:
The difference, however, between not paying a dentist's or barber's bill and defrauding a phone company is that the dentist or barber do not own the electricity they use to provide services to customers, but rather pay a *715 utility company to heat and light their offices. AT&T, by contrast, must buy AC power, turn it into DC power, and store it in batteries at one of its networks. The electricity used by AT&T is thus its "property" for purposes of the theft-by-fraud statute.[18]
¶ 62. The majority opinion's theory of the distinctiveness of electricity that powers telephone service based on the telephone company's ownership of electricity is not supported by fact or law.
¶ 63. First, it seems to me that the majority opinion may be misreading the record regarding the concept of and importance of the telephone company's storage and "ownership" of electricity. Very little testimony discusses this issue. No one focused on this topic at trial. Yet a plain reading of Robert Lindsley's testimony seems to indicate that the telephone company only converts and stores electricity for use during a power outage and may simply transmit the electricity it normally receives.
¶ 64. Furthermore, other service providers may also store (and thus "own") electricity for later use.[19] A dentist purchases electricity to charge the laptop, cell *716 phone, cordless phone, portable x-ray machine, and other portable electronic devices. The dentist stores the electricity in the devices' batteries and then uses the electricity later to perform a service.[20]
¶ 65. Second, as a matter of law, the majority opinion's reliance on the telephone company's "ownership of electricity" as the determinative factor under the statute at issue is erroneous. This ownership distinction is contrary to law and the purpose of the theft statute.[21]
*717 ¶ 66. The purpose of the theft statutes is to prevent the taking of property without the consent of the owner or the person who has constructive or actual possession.[22]
¶ 67. Property may be stolen from anyone who has the right to possess and use a thing to the exclusion of others.[23] Possession and control over the use of property is all that is required in order for it to be stolen. Electricity may be diverted (stolen) from one that takes and stores electricity or one that simply pays to possess and use electricity.
¶ 68. The two dead giveaways for me that the State was prosecuting the defendant for theft of telephone services, not for the theft of electricity, were the charging documents and the State's argument that the value of the telephone services stolen equals the value of the electricity stolen.[24]
¶ 69. The criminal complaint and information do not mention electricity. These documents simply allege that the defendant stole both services and property.
¶ 70. The only reference in the complaint to the stolen property and its value is in Section 1 of the complaint, entitled Summary of Allegations, which explains, "All tolled [sic], SBC representatives calculate that this fraud group bilked the Phone Company out of about $40,000 in phone service fees."
*718 ¶ 71. The First Amended Information alleges that the defendant conspired to "obtainO title to the property of [the telephone company], having a value exceeding $10,000... [by making] a false promise to pay for telephone service accounts ...." The information does not specify the property that was the object of the conspiracy.[25]
*719 ¶ 72. The State not only made no effort to explain in the charging documents that the defendant stole electricity, but also made no effort at trial to quantify or qualify the amount or type of electricity stolen, or its value at the time it was stolen.
¶ 73. The State has the burden to prove what property was stolen — how much property, what kind of property, and the value of the property.
¶ 74. The State did not proffer any information at trial to quantify, qualify, or value the electricity that was allegedly stolen — how much electricity, what kind of electricity, or the value of the electricity stolen. Rather, the State proved the number of telephone minutes used and the value of the telephone services.
¶ 75. The best the majority opinion can put forth (and it is not good enough to convince me) is to explain that "AT&T purchases and stores electricity to power *720 its network. When consumers make phone calls, AT&T must buy more electricity. The conspiracy perpetrated against AT&T therefore deprived the company of its property." Majority op., ¶ 5.
¶ 76. For the reasons set forth, I conclude that the defendant's bilking the telephone company was theft of telephone services, not theft of electricity under the statute. As Assistant Attorney General William Platz and Professor Gordon Baldwin both explained more than a half century ago, theft of services is not covered by Wis. Stat. § 943.20. The simple fact that electricity is used to power telephone service does not morph a theft of these services into a theft of electricity.
II
¶ 77. Even if stealing telephone services would constitute stealing electricity under the statute at issue, and it does not, the value of the electricity stolen is not, as a matter of law or fact, equal to the value of the telephone services. The State and the majority opinion can add whatever adjectives they like before the term "electricity," but to convict an individual for a Class G felony under § 943.20, the State must prove that the individual in fact stole a quantifiable and valuable amount of electricity in excess of $10,000.
¶ 78. The value of the electricity stolen is an important factor because the penalty for theft ranges from a misdemeanor through a Class G felony depending on the value of the property stolen.[26]
*721 ¶ 79. Value is statutorily defined as "the market value at the time of the theft or the cost to the victim of replacing the property within a reasonable time after the theft, whichever is less."[27]
¶ 80. Although the fair market value (or replacement value) of the stolen property is not an element of theft, when a criminal statute prescribes a penalty based on the value of the property, the fact finder (here the jury) determines the value of the property stolen and the jury's determination must be supported by the evidence. The sentence for a theft felony cannot stand when there is no factual basis for the value of the stolen property.[28]
¶ 81. The burden is on the State to prove the value of the stolen electricity. The majority erroneously flips the burden to the defendant to prove the quantity and value of electricity used to make each call. Majority op., ¶ 24 n.8.
¶ 82. The State proved only the "fair market value" of the telephone calls, not the "fair market value" of the electricity stolen and not the "replacement cost" of the electricity stolen. The State was content with not offering the quantity and value of the stolen electricity even though at trial AT&T's engineer, Robert Lindsley, testified that it would be possible to determine how much electricity was used to power each of the defendant's phone calls, but "it would be a very labor intensive process."
*722 ¶ 83. Moreover, according to the testimony, the cost of the electricity used to provide telephone service does not equal the amount the telephone company charges for telephone service. Additional costs beyond the cost of electricity factor into the fees the telephone company charges for telephone service. Testimony at trial was that the telephone service fees paid by consumers not only pay for the electricity used to power the system, but also pay for the transmission wires, cables, offices, employees, and other machines and equipment.
¶ 84. Thus, the fair market value of the stolen telephone service that the State offered at trial is not equal to the fair market value of the electricity stolen. Accordingly, as a matter of law or fact, the State did not prove the value of the electricity stolen.
¶ 85. The majority opinion follows the lead of the court of appeals, equating "applied electricity" to the entire telephone service as follows: "[T]he market value to the telephone company of the services [fraudulently obtained] is the correct measure of the value of the stolen property in this case... . The undisputed evidence is that the phone company lost over $26,000 in billable services — i.e. applied electricity... ,"[29]
¶ 86. The State did not prove the value of the electricity stolen. Even if the statute is interpreted to mean the applied electricity in the present case, and I do not so interpret the statute, the State did not prove that the value of the stolen property exceeds $2,500.[30] Under these circumstances the felony conviction must *723 be vacated, a conviction of a Class A misdemeanor must be entered, and the cause must be remanded for resentencing.[31]
¶ 87. For the reasons set forth, I dissent.
¶ 88. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

 Wis. Stat. § 939.10. See also State v. Genova, 77 Wis. 2d 141, 145-46, 252 N.W.2d 380 (1977).

 Wisconsin Stat. § 943.20(l)(d) reads:
(1) Acts. Whoever does any of the following may be penalized as provided in sub. (3):
(d) Obtains title to property of another person by intentionally deceiving the person with a false representation which is known to he false, made with intent to defraud, and which does defraud the person to whom it is made. "False representation" includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme.

Wisconsin Stat. § 943.20(3)(c) provides:
(3) Penalties. Whoever violates sub. (1):
(c) If the value of the property exceeds $10,000, is guilty of a Class G felony.

 I agree with the majority opinion that the defendant engaged in false representation to defraud the telephone company.

 The jury was instructed that under Wisconsin law the term "property" includes electricity.

 Wis. Stat. § 943.20(2)(b).

 Theft of services cannot be prosecuted under Wis. Stat. § 943.20 of the Criminal Code. See William A. Platz, The Criminal Code, 1956 Wis. L. Rev. 350.
Early drafts of the statute in 1950 (Bill No. 784, S.) and 1953 (Bill No. 100, A.,), included explicit language listing services as property subject to theft under § 943.20. See Drafting Records for 1950 Bill No. 784, S. and 1953 Bill No. 100, A., on file at Wis. Legislative Reference Bureau, Madison, Wis.
The legislature later removed all language regarding services and intangible property from the statute it eventually enacted in 1955. Ch. 696, Laws of 1955, § 943.20(2)(a) (eff. July 1, 1956).
In 1960, Gordon B. Baldwin, Professor of Law and assistant dean at the University of Wisconsin Law School, summarized the comprehensive changes to the Criminal Code regarding misappropriation. He explained that the definition of property *708 in § 943.20 "does not reach the deceiver who takes labor and services from another without any intention of paying." Professor Baldwin advised that "[i]f criminal sanctions are needed to protect [service providers] specific statutes must be enacted." Professor Baldwin wrote:
The comprehensive definition of property in the Criminal Code does not, however, reach all persons who intend a misappropriation. It does not reach the deceiver who takes labor and services from another without any intention of paying. The doctor, architect, engineer and garagemen [sic] may be victimized and deserves protection, hut the property definitions are not comprehensive enough to cover these misappropriations of services and time. If criminal sanctions are needed to protect them specific statutes must be enacted (emphasis in original).
Gordon B. Baldwin, Criminal Misappropriation in Wisconsin - Part I, 44 Marq. L. Rev. 253, 262 (Winter 1960-61).

 The State might have charged and proved a violation of Wis. Stat. § 943.45, entitled "Theft of Telecommunications Service." The penalty is, at most, a Class B misdemeanor.
The State in future similar cases might use Wis. Stat. § 943.50, creating a felony for the theft of services valued at more than $500. This statute was enacted in 2011, after the defendant's conduct and the trial in the present case occurred.

 See, e.g., 8 Cyclopedia of Applied Electricity 483 (1921) (glossary of electrical terms); see also Clair A. Bayne, Applied Electricity & Electronics 656-70 (2000) (glossary of important terms).

 Testimony of Robert Lindsley, in part:
When the telephone company bills a telecommunications network, it also bills a power network to support that telecommunications network. That power network splices electricity to the telephone network, and without that electricity, the telephone network would not be able to — to cause communications to occur over that network. Basically, when you, you know, use your phone, you are using an applied form of electricity.
When Robert Lindsley was asked whether he knew the telephone company's cost to power the phone system, he testified that he did not.

 State's court of appeals brief at 16.

 State v. Steffes, 2012 WI App 47, ¶¶ 23-24, 340 Wis. 2d 576, 812 N.W.2d 529.

 State's Brief at 28.

 1 Cyclopedia of Applied Electricity 7 (1921). Still, the term "applied electricity" is not found in the Table of Contents or the Index.
The phrase "applied electricity" is most often used as a textbook title, in a similar manner to the phrase "Applied Mathematics."
*712 See also Principles of Electricity Applied to Telephone and Telegraph Work (1961) (The title page describes the text as "[a] Training Course Text Prepared for Employees of the Long Lines Department, American Telephone and Telegraph Company." The Preface explains that this edition of the text "has required the introduction of certain basic concepts and principles not dealt with in earlier editions, as well as numerous examples to illustrate their applications in practice."); Clair A. Bayne, Applied Electricity and Electronics (2000) (The phrase "applied electricity" is in the title of the text, but is not found in the Table of Contents, the Index, or the Glossary of Important Terms.).

 1 Cyclopedia of Applied Electricity 8 (1921). For a discussion of electricity applied to the telephone, see 8 Cyclopedia of Applied Electricity 11-90 (1921).

 State's Brief at 32 n.15 (emphasis in original).

 Testimony from AT&T expert Robert Lindsley:
There are two different forms of power. There is AC power, which is what you would get out of your AC outlet at your home, and you are getting that from the commercial utility. And then there is DC power. The difference between AC and DC power is DC power, which is direct current power, can be stored in batteries. AC power cannot be stored in batteries.
So the telephone company actually buys AC power from the commercial utility, rectifies that DC — or excuse me. The AC power into a DC form, stores that energy in batteries so that if we lose commercial power to our central office, your phone continues to work.

 Majority op., ¶ 26 (emphasis in original).

 The majority opinion attempts to distinguish the telephone company from other service providers and yet asserts at the same time that comparing service providers creates a slippery slope and unnecessary hypotheticals. Majority op., ¶¶ 26-27.
Looking at how other service providers use electricity and at whether theft of their services can be prosecuted under the majority opinion's interpretation of the statute at issue is helpful to ensure that the statute is being interpreted correctly and that it will be applied consistently in the future to similar cases. Were a person to fraudulently acquire cable television or internet service or a ticket on an electric train, could that *716 person be successfully prosecuted for stealing electricity under the majority opinion's interpretation of the statute at issue in the present case?

 See John Bird, Electrical and Electronic Principles and Technology 28-29 (3d ed. 2007):
The battery is now over 200 years old and batteries are found almost everywhere in consumer and industrial products. Some practical examples where batteries are used include:
In laptops, in cameras, in mobile phones, in cars, in watches and clocks, for security equipment, in electronic meters, for smoke alarms, for meters used to read gas, water and electricity consumption at home, to power a camera for an endoscope looking internally at the body, and for transponders used for toll collection on highways throughout the world.

 Mitchell v. State, 84 Wis. 2d 325, 339, 267 N.W.2d 349 (1978) (the offenses involving personal property contained in Chapter 943 consistently make possession of the property, not ownership, the key factor).
See also Wis. Stat. § 943.32(3) (for purposes of the robbery statute, "owner" means a person in possession of property whether the person's possession is lawful or unlawful).
See also Wis. Stat. § 971.33, Possession of property (in the prosecution of a crime committed by stealing, damaging, or fraudulently receiving or concealing personal property, it is sufficient if it is proved that at the time the crime was committed either the actual or constructive possession or the general or special property in any part of such property was in the person alleged to be the owner thereof).

 See generally 3 Wayne R. LaFave, Substantive Criminal Law § 19.2(a) (2d ed. 2003).

 See Mitchell v. State, 84 Wis. 2d 325, 339, 267 N.W.2d 349 (1978).

 According to testimony at trial, telephone service fees paid by telephone customers not only pay for the electricity used to power the system, but also pay for the transmission wires, cables, offices, employees, and other machines and equipment.

 The defendant was initially charged in 2004, pled no contest, was sentenced, and then was permitted to withdraw his no-contest plea in 2009. After the plea was withdrawn, a Third Amended Information was filed, which restated charges filed years earlier in the First Amended Information. The Third Amended Information is not in the record, but the First Amended Information is in the record, and represents the charges brought at trial.
First Amended Information:
COUNT 01: CONSPIRACY TO MISAPPROPRIATE PERSONAL IDENTIFYING INFORMATION, HABITUAL CRIMINALITY (As to Defendants Matthew Steffes and Joshua Howard)
Between about July 1, 2002 and December 1, 2002, at various locations within the County of Milwaukee, with intent that a crime be committed, did combine with another for the purpose of committing a crime, viz:
The crime of Identity Theft...
COUNT 02: CONSPIRACY TO COMMIT THEFT BY FRAUD (VALUE > $10,000), HABITUAL CRIMINALITY (As to Defendants Matthew Steffes and Joshua Howard)
Between about July 1, 2002 and July 1, 2003, at various locations within the County of Milwaukee, with intent that a crime be committed, did combine with another for the purpose of committing a crime, viz.:
The crime of Theft by Fraud, whereby the conspirators did combine for the purpose of obtaining title to the property of SBC, having a value exceeding $10,000, by intentionally deceiving SBC with a false representation known by the conspirators to be false, viz. a false promise to pay for telephone service accounts created in the name of Nick Steffes, which representation made with intent to defraud and which did defraud SBC, and furthermore one or more *719 co-conspirators did an act to effect the conspiracy's object contrary to Wisconsin Statutes section 943.20(l)(d) & (3)(c) and 939.31 and 939.62 (emphasis added).
COUNT 03: CONSPIRACY TO COMMIT THEFT BY FRAUD (VALUE > $10,000), HABITUAL CRIMINALITY (As to Defendants Matthew Steffes and Joshua Howard)
Between about July 1, 2002 and July 1, 2003, at various locations within the County of Milwaukee, with intent that a crime be committed, did combine with another for the purpose of committing a crime, viz.:
The crime of Theft by Fraud, whereby the conspirators did combine for the purpose of obtaining title to the property of SBC, having a value exceeding $10,000, by intentionally deceiving SBC with a false representation known by the conspirators to be false, viz. a false promise to pay for telephone service accounts created in the name of Jamie Douyette, which representation was made with intent to defraud and which did defraud SBC, and furthermore one or more co-conspirators did an act to effect the conspiracy's object contrary to Wisconsin Statutes section 943.20(l)(d) & (3)(c) and 939.31 and 939.62 (emphasis added).

 In Sartin v. State, this court explained:
While .. . the value of the property stolen is not an element of the crime of theft, nevertheless value is of the utmost importance in determining the applicable penalty upon conviction.
*721 Sartin v. State, 44 Wis. 2d 138, 148, 170 N.W.2d 727 (1969). See also White v. State, 85 Wis. 2d 485, 490, 492-93, 271 N.W.2d 97 (1978).

 Wis. Stat. § 943.20(2)(d).

 White v. State, 85 Wis. 2d 485, 490, 492-93, 271 N.W.2d 97 (1978) (a factual basis must be established for value; "Value must be determined before an appropriate penalty can be imposed ...."); Sartin v. State, 44 Wis. 2d 138, 151, 170 N.W.2d 727 (1969).

 State v. Steffes, 2012 WI App 47, ¶¶ 23-24, 340 Wis. 2d 576, 812 N.W.2d 529.

 The minimum value of property stolen required for theft to be classified as a felony is $2,500. Wis. Stat. § 943.20(3)(a) If the value of the property does not exceed $2,500, [whoever violates sub. 1] is guilty of a Class A misdemeanor.

 White v. State, 85 Wis. 2d 485, 493, 271 N.W.2d 97 (1978).