# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2011AP691-CR |
| COMPLETE TITLE: | State of Wisconsin,<br>　　　　　Plaintiff-Respondent,<br>　　v.<br>Matthew R. Steffes,<br>　　　　　Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 340 Wis. 2d 576, 812 N.W.2d 529
(Ct. App. 2012-Published)
PDC No: 2012 WI App 47

| | |
|---|---|
| OPINION FILED: | June 20, 2013 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 12, 2013 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Milwaukee |
| 　JUDGE: | Thomas P. Donegan |

| | |
|---|---|
| JUSTICES: | |
| 　CONCURRED: | |
| 　DISSENTED: | ABRAHAMSON, C.J., BRADLEY, J., dissent. (Opinion filed.) |
| 　NOT PARTICIPATING: | |

ATTORNEYS:

　　For the defendant-appellant-petitioner, there were briefs by *Jeffrey W. Jensen*, Milwaukee, and oral argument by *Jeffrey W. Jensen*.

　　For the plaintiff-respondent, the cause was argued by Daniel J. O'Brien, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general, with assistance from *Jason Gorn*, legal extern.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2011AP691

(L.C. No.  2004CF2138)

STATE OF WISCONSIN            :        IN SUPREME COURT

**State of Wisconsin,**

     **Plaintiff-Respondent,**

   **v.**

**Matthew R. Steffes,**

     **Defendant-Appellant-Petitioner.**

**FILED**

**JUN 20, 2013**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeal.  *Affirmed.*

¶1   MICHAEL J. GABLEMAN, J.   We review a published decision of the court of appeals affirming Matthew R. Steffes's conviction of two counts of conspiracy to commit theft of property by fraud.  See State v. Steffes, 2012 WI App 47, 340 Wis. 2d 576, 812 N.W.2d 529.  While in prison, Steffes was part of a conspiracy that defrauded AT&T out of more than $28,000 of phone services through a scheme that involved furnishing the company with fraudulent information.  Specifically, Steffes and his cellmate——with the help of friends and family members

outside of prison——submitted fictitious business names and stolen personal identifying information to AT&T to set up phone numbers. Steffes would then make collect calls to these numbers with the knowledge they would never be paid for. The plan would work for short bursts of time; once it was clear that the phone bill was not going to be paid, AT&T would shut down the number. Steffes and the other members of the conspiracy would then move on and set up a new telephone number. Over the course of the eighteen-month life of this plan, Steffes made 322 phone calls, free of charge.

¶2 Steffes was subsequently charged and convicted of two counts of conspiracy to commit theft by fraud of property in excess of $10,000. See Wis. Stat. §§ 939.31, 943.20(1)(d), and 943.20(3)(c) (2011-12).[1]

¶3 Two issues are presented in this case. The first is whether submitting fictitious business names and stolen personal identifying information is a "false representation" under Wis. Stat. § 943.20(1)(d). Steffes alleges that such conduct is not a false representation because the statute requires that the actor make an express promise to pay. The second issue is whether the applied electricity that AT&T uses to power its network is included within the definition of "property" found in § 943.20(2)(b). Steffes argues that his conviction cannot be

---

[1] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated. Nothing has changed in any applicable statute since the relevant conduct occurred.

sustained because the evidence at trial showed that he stole telephone services and not property.

¶4 On the first issue we hold that Steffes made "false representations" to AT&T. The theft-by-fraud statute says that "'[f]alse representation' includes a promise made with intent not to perform if it is part of a false and fraudulent scheme." Wis. Stat. § 943.20(1)(d) (emphasis added). Because the word "includes" is not restrictive, the statute clearly anticipates that other conduct aside from an express promise falls under the umbrella of a "false representation." The scope and history of the theft-by-fraud statute make plain that providing fictitious business names and stolen personal identifying information to a phone company as a way of avoiding payment falls within the meaning of "false representation."

¶5 As to the second issue, "property" under the theft-by-fraud statute is defined as "all forms of tangible property, whether real or personal, without limitation including electricity, gas and documents which represent or embody a chose in action or other intangible rights." Wis. Stat. § 943.20(2)(b) (emphasis added). Relying on the plain language of the statute in conjunction with commonly used dictionaries, we conclude that Steffes stole electricity from AT&T. AT&T purchases and stores electricity to power its network. When consumers make phone calls, AT&T must buy more electricity. The conspiracy perpetrated against AT&T therefore deprived the company of its property. We affirm the court of appeals.

3

## I. FACTUAL BACKGROUND

¶6 While Matthew Steffes and Joshua Howard were cellmates at the Waupun Correctional Institution, Howard devised an illicit scheme that would allow the two of them to make free collect calls from prison. The conspiracy worked as follows. Friends and family members outside the prison walls would set up a phone number by giving false information to the phone company——in this case AT&T.[2] Once the dummy number was set up, Howard and Steffes could make unlimited collect calls to the number. The benefit to the people setting up the fraudulent numbers was that they would receive free phone service for a short period of time. After the phone company would shut the number down because of unpaid bills, the process would start over again.

¶7 The plan was elaborate and long-lasting, involving Steffes's father, his sister (who also has a child with Howard), his cousin, several friends, and another woman who has a child with Howard. In sum, 60 fraudulent phone numbers were created between May 2002 and May 2003. Part of the operation entailed giving fictitious business names to AT&T, while other numbers were set up using stolen personal identifying information obtained through a health care clinic where Steffes's sister's roommate worked. Over an 18-month period in 2002 and 2003, Steffes made 322 calls totaling 6,562 minutes. The loss to AT&T

---

[2] SBC was the phone company that suffered the losses, but at the time of trial it had been renamed AT&T. See Shawn Young, SBC Completes AT&T Purchase, Takes New Name, Wall St. J., Nov. 19, 2005, at A8. To avoid confusion, we will exclusively designate the phone company as "AT&T" throughout this opinion.

from setting up the fraudulent phone numbers and the unpaid calls was $28,061.41.

## II. PROCEDURAL HISTORY

¶8 Steffes was charged with two counts of conspiracy to commit theft by fraud of property in excess of $10,000 pursuant to Wis. Stat. §§ 939.31, 943.20(1)(d), and 943.20(3)(c).[3] Section 939.31 is the conspiracy statute and it provides that "whoever, with intent that a crime be committed, agrees or combines with another for the purpose of committing that crime may, if one or more of the parties to the conspiracy does an act to effect its object, be fined or imprisoned or both." The theft-by-fraud statute, § 943.20(1)(d), makes it a crime to obtain "title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made." "Property" is defined as "all forms of tangible property, whether real or personal, without limitation including electricity, gas and documents which represent or embody a chose in action or other intangible

---

[3] The State brought two charges because Steffes helped set up one group of phone numbers under the fictitious business name "Nick's Heating & Cooling" and another under "Douyette Typing Service" or "Douyette Advertising Service." The loss to AT&T from the former was $13,541.63 and the latter $14,519.78.

Steffes was also charged with but acquitted of one count of conspiracy to commit identity theft.

rights." § 943.20(2)(b). Steffes pled not guilty and the case proceeded to a jury trial.[4]

¶9 Robert Lindsley, an engineer for AT&T, testified at trial that someone making a phone call is using "an applied form of electricity," and that all telephone companies need a "power network" to connect electricity to the telephone network. The key to understanding this concept, Lindsley explained, rests in the difference between AC and DC power. AC power is the electricity that runs through outlets in a wall. Conversely, DC power is stored in batteries. In Lindsley's words, "the telephone company actually buys AC power from the commercial utility[,] [turns] AC power into a DC form, [and] stores that energy in batteries so that if we lose commercial power to our central office, your phone continues to work."

¶10 According to Lindsley, AT&T customers are given a "subscriber pair." This is a wire that connects the registered phone line to the switch at AT&T's central office. The switch is what directs a phone call to the dialed number and connects the circuit, so when a customer makes a phone call he is not only using the subscriber pair, but also power from the switch. As Lindsley explicated, "We digitize the signal, so it uses equipment that can transmit that telephone call either through

---

[4] Steffes was originally charged in 2004 but did not stand trial until five years later. Because the procedural history leading up to the trial is not germane to the issues at hand, we will not recount it.

fiberoptic cables, over cable systems, or even through radio links using radio towers."

¶11  Steffes was convicted of two counts of conspiracy to commit theft by fraud.  The court sentenced him to two years in prison followed by thirty months of extended supervision on each count, to be served concurrently.  He and the other members of the conspiracy were also ordered to jointly and severally pay the full $28,061.41 loss in restitution to AT&T.  Steffes appealed his conviction to the court of appeals and argued: (1) the evidence was insufficient to support his conviction because no "false promise" was made during the commission of the conspiracy; (2) the applied form of electricity used by AT&T is more akin to a service and thus is not property for purposes of the theft-by-fraud statute.[5]

¶12  In a published opinion, the court of appeals affirmed his conviction.  Steffes, 340 Wis. 2d 576.  On the issue of whether a "false promise" was made during the conspiracy, Steffes argued that because no member of the conspiracy actually told the telephone company that he would pay for the services, no "false promise" was made.  The court of appeals held that the theft-by-fraud statute does not require evidence of an express false promise; the statute requires only that "the offender 'intentionally  deceiv[e]'  the  victim  'with  a  false

---

[5] Steffes also alleged that he was entitled to resentencing and that the circuit court issued erroneous jury instructions. Steffes does not raise his sentencing claim before this court. As for the jury instruction issue, we address that in footnote 7, infra, of this opinion.

representation . . . known to be false, made with intent to defraud.'" Id., ¶17 (quoting Wis. Stat. § 943.20(1)(d)). Here, all the false identifying information that the conspirators gave to AT&T amounted to false representations. Steffes, 340 Wis. 2d 576, ¶17.

¶13 As to the second question——whether applied electricity is property under the theft-by-fraud statute——the court of appeals held that the presence of the term "electricity" in Wis. Stat. § 943.20(2)(b) is "broad enough to encompass the transmission of electricity over telephone lines." Steffes, 340 Wis. 2d 576, ¶23. Because the statute does not specifically distinguish between different types of electricity, the court of appeals reasoned that the legislature intended the term "electricity" to be applied broadly and to encompass electricity transmitted over telephone lines. Id.

¶14 We granted Steffes's petition for review and now affirm the court of appeals.

### III. STANDARD OF REVIEW

¶15 There are two issues presented for our review. The first is whether submitting fictitious business names and stolen personal identifying information is a "false representation" under Wis. Stat. § 943.20(1)(d). The second is whether the applied electricity that AT&T uses to power its network is included within the definition of "property" found in § 943.20(2)(b). These are questions of statutory interpretation which we review de novo. Crown Castle USA, Inc. v. Orion

8

_Constr. Group, LLC_, 2012 WI 29, ¶12, 339 Wis. 2d 252, 811 N.W.2d 332.

## IV.  DISCUSSION

¶16  We first hold that submitting fictitious business names and stolen personal identifying information as a means of setting up phone numbers constitutes a "false representation" for purposes of the theft-by-fraud statute.  On the second question we hold that because AT&T must purchase and store electricity to power its network, it was defrauded out of its property by Steffes and his fellow conspirators.  For these reasons, Steffes was appropriately prosecuted for conspiracy to commit theft by fraud and the evidence presented at trial satisfied all the elements of that crime.

### A.  Submitting Fictitious Business Names and Stolen Personal Identifying Information Constitutes a "False Representation"

#### 1.  History of Theft of Property by Fraud

¶17  The crime of theft by fraud traces its roots to a 1757 Act of the Parliament of Great Britain, which provided that

> All persons who knowingly and designedly, by false pretense or pretenses, shall obtain from any person or persons, money, goods, wares or merchandizes, with intent to cheat or defraud any person or persons of the same . . . shall be . . . fined and imprisoned, or . . . be put to pillory, or publicly whipped or . . . transported . . . for the term of seven years . . . .

James E. Simon, _A Survey of Worthless Check Offenses_, 14 Mil. L. Rev. 29, 30 (1961) (quoting 30 Geo. 2, c.24, § 1).  Prior to the

passage of this statute, English common law did not recognize the "crime of obtaining property by false pretenses," as it was then known. State v. Semrau, 199 A.2d 580, 582 (Conn. App. Ct. 1963). Instead, the remedy for someone who was defrauded out of property was in civil court: "[W]e are not to indict one man for making a fool of another: let him bring his action." Reg. v. Jones, (1703) 91 Eng. Rep. 330 (Q.B.).

¶18 The law passed by Parliament served as a template for false pretense statutes in most American states. Simon, A Survey of Worthless Check Offenses, 14 Mil. L. Rev. at 30. Indeed, Wisconsin's very first compilation of statutes contained similar language. See Wis. Stat. ch. 134, § 33 (1849).[6] As this court stated in 1859, one of the goals of the false pretense statute was to "protect the weak and credulous from the wiles and stratagems of the artful and cunning." State v. Green, 7 Wis. 571 [*676], 580 [*685] (1859) (quoting the Supreme Judicial Court of Massachusetts's interpretation of an identical statute in Commonwealth v. Drew, 36 Mass. 179, 184 (1837)). Or as the

---

[6] That statute read:

> If any person shall designedly, by any false pretence or by any privy or false token, and with intent to defraud, obtain from any other person any money or goods, wares, merchandize or other property, or shall obtain with such intent the signature of any person to any written instrument, the false making whereof would be punishable as forgery, he shall be punished by imprisonment in the state prison not more than five years nor less than one year, or by fine not exceeding five hundred dollars nor less than fifty dollars.

Wis. Stat. ch. 134, § 33 (1849).

10

court of appeals more recently described it: "The purpose in creating the statute was to protect unsuspecting citizens from swindlers who, realizing that the crimes of larceny and embezzlement required that property be taken without the owner's consent, obtained the property of others with their consent by means of willful misrepresentation and deliberate lying." State v. O'Neil, 141 Wis. 2d 535, 539, 416 N.W.2d 77 (Ct. App. 1987).

¶19 In the ensuing decades, a plethora of fraud and larceny statutes were added to Wisconsin's "offenses against property" statutory chapter. See generally Wis. Stat. Ch. 343 (1953). The current theft-by-fraud statute was enacted in 1955 as a way of condensing these crimes into one law. See § 1, ch. 696, Laws of 1955; State v. Meado, 163 Wis. 2d 789, 797, 472 N.W.2d 567 (Ct. App. 1991) ("One of the objectives of the 1955 revision was to simplify the language and to state fully the prohibition in fewer words than the previous statutes."). It is with this background in mind that we apply the contemporary statute to Steffes's argument that his conviction must be reversed because no member of the conspiracy promised to pay AT&T for the phone services and thus no "false representation" was made.

2. Steffes's Conduct as a Conspirator Falls Under Wis. Stat. § 943.20(1)(d)

¶20 The theft-by-fraud statute makes it illegal to:

Obtain[] title to property of another person by intentionally deceiving the person with a false

11

representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. "False representation" includes a promise made with intent not to perform if it is a part of a false and fraudulent scheme.

Wisconsin Stat. § 943.20(1)(d). Because Steffes was charged with conspiracy to commit theft by fraud, the State was required to prove that only one member of the conspiracy made a "false representation." See Wis. Stat. § 939.31. We hold that providing fictitious business names and stolen personal identifying information to a phone company with the intent of setting up temporary phone numbers constitutes a "false representation."

¶21 The key to understanding why Steffes's argument lacks merit is the second sentence of the statute. It says that a false representation "includes a promise made with intent not to perform." Wis. Stat. § 943.20(1)(d) (emphasis added). If "includes" were replaced with "means" or "is," Steffes's position would be on stronger footing. The word "includes," though, is not restrictive. See 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutory Construction, § 47:7 (7th ed. West 2012) ("[T]he word 'includes' is usually a term of enlargement, and not of limitation . . . . It, therefore, conveys the conclusion that there are other items includable, though not specifically enumerated . . . .") (citations omitted). "Including" is another way of saying "is not limited to." See State v. Popenhagen, 2008 WI 55, ¶41 n.20, 309 Wis. 2d 601, 749 N.W.2d 611. To reach the result desired by Steffes, we would have to either rewrite or ignore the plain language of the

12

statute. This we may not do. See City of Menasha v. WERC, 2011 WI App 108, ¶18, 335 Wis. 2d 250, 802 N.W.2d 531 (noting that a court "may not substitute [its] judgment for that of the legislature; [it] may not rewrite the statute.").

¶22 A court may read the word "includes" in a restrictive manner only if "there is some textual evidence that the legislature intended the word 'includes' to be interpreted as a term of limitation or enumeration." Popenhagen, 309 Wis. 2d 601, ¶43. There is nothing in the two sentences of Wis. Stat. § 943.20(1)(d) to indicate that the legislature limited "false representation" to situations where an individual makes an express promise to pay for items he has no intention of paying for. In fact, the statute quite clearly says just the opposite. Accordingly, we reject Steffes's reading of the statute.[7]

---

[7] For similar reasons, we dismiss Steffes's argument that the circuit court gave improper jury instructions. The standard jury instructions for theft by fraud define "false representation" as "one of past or existing fact. It does not include expressions of opinions or representations of law." Wis. JI——Criminal 1453A. The circuit court used this language but also added that "[a] representation may be expressed, or it may be implied from all of the circumstances surrounding the transaction." Steffes alleges that this addition rendered the court's instructions legally incorrect.

As a general matter, we first note that a circuit court has wide latitude to give instructions based on the facts of a case. State v. McCoy, 143 Wis. 2d 274, 289, 421 N.W.2d 107 (1988). The court may exercise its discretion regarding both the language and emphasis of the instruction. Id. "Only if the jury instructions, as a whole, misled the jury or communicated an incorrect statement of the law will we reverse and order a new trial." State v. Laxton, 2002 WI 82, ¶29, 254 Wis. 2d 185, 647 N.W.2d 784.

¶23 Having rejected Steffes's view that the State was required to show that a member of the conspiracy promised to pay for the phone services, we hold that there was ample evidence that a "false representation" was made. Telephone companies require new customers to provide contact information for a reason: if the customer does not pay, the information enables the company to shut off service, demand payment, and if necessary, begin collection proceedings. A phone company's contractual rights are therefore violated when individuals give false information in order to evade payment. If Steffes were correct, telephone providers would be required to undertake exhaustive background checks on each potential customer to ensure that the information provided was accurate. The theft-by-fraud statute does not require the State to show that a consumer made an express promise to retailers that he would pay the full amount owed. The evidence in this case more than supports the jury's finding that false representations were made. See State v. Poellinger, 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) (this court will uphold a conviction if any reasonable inferences support it).

---

As we explain in this opinion, making an express promise to pay is one way, but not the only way, to make a "false representation." Given the facts in this case, it was not only entirely appropriate for the circuit court to instruct the jury as it did, but it would have been legally incorrect for the court to say that a false representation required an express promise to pay, as Steffes believes. The circuit court was well within its discretion to choose the words that it did.

## B. The Applied Form of Electricity Used by AT&T is "Property" Under Wis. Stat. § 943.20(2)(b)

¶24 Steffes next alleges that his conviction should be reversed because what he and his co-conspirators stole was not property, but rather telephone services.[8]  According to Steffes,

---

[8] Steffes also presented a narrower version of this argument before the court of appeals.  There, he asserted that the evidence adduced at trial was insufficient to prove that he stole more than $2,500 worth of electricity, and thus his convictions should be reduced from a felony to a misdemeanor.  See Wis. Stat. § 943.20(3)(a) (making it a Class A misdemeanor if the property stolen does not exceed $2,500).  Steffes does not make this argument before our court, and in any event, we reject this contention.  At trial, when Robert Lindsley (an AT&T engineer) was asked how much electricity is used in a typical phone call, he replied that he could not "quantify" the amount "because every circuit is different" depending on the distance of the call.  Steffes presented no evidence that the amount of electricity stolen was less than $2,500.  The State, meanwhile, made its case that Steffes stole $13,541.63 of property in count one and $14,519.78 in count two.  On both counts, the jury was asked the following on the verdict form:

> Was the value of the property stolen more than $10,000?
>
> Yes___ No ___
>
> If you answer the preceding question NO, then answer this question:
>
> Was the value of the property stolen more than $5,000?
>
> Yes___ No ___
>
> If you answer the preceding question NO, then answer this question:
>
> Was the value of the property stolen more than $2,500?
>
> Yes___ No ___

15

the applied electricity used by AT&T to power its network does not fall within the ambit of the statute. The State responds that because AT&T owns the electricity that powers the telephone lines, the conspiracy carried out by Steffes and the others clearly amounted to theft of AT&T's property via fraud.

¶25 To restate, "property" under the theft-by-fraud statute is defined as "all forms of tangible property, whether real or personal, without limitation including electricity, gas and documents which represent or embody a chose in action or other intangible rights." Wis. Stat. § 943.20(2)(b) (emphasis added). "Electricity" is not given a specific definition in the statute. "When a word of common usage is not defined in a statute, we may turn to a dictionary to ascertain its meaning." Burbank Grease Servs., LLC v. Sokolowski, 2006 WI 103, ¶14, 294 Wis. 2d 274, 717 N.W.2d 781. In searching for the appropriate dictionary definition of "electricity" we are mindful of the "ordinary-meaning canon," which provides that "[w]ords are to be understood in their ordinary, everyday meaning——unless the context indicates that they bear a technical sense." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of

---

The jury answered that the property stolen from AT&T was worth more than $10,000 on both counts. Given the evidence presented at trial by the State, we will not disturb the jury's conclusion that Steffes stole more than $10,000 of applied electricity from AT&T. See Morden v. Cont'l AG, 2000 WI 51, ¶39, 235 Wis. 2d 325, 611 N.W.2d 659 ("[A]ppellate courts search the record for credible evidence that sustains the jury's verdict, not for evidence to support a verdict that the jury could have reached but did not.").

16

Legal Texts 69 (2012). A court "should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise." Id. at 70. As nothing in § 943.20(2)(b) indicates that "electricity" was intended to have a technical meaning, we will look at the common understanding of the word. One dictionary defines "electricity" as an "[e]lectric current used or regarded as a source of power." The American Heritage Dictionary of the English Language 575 (5th ed. 2011). Another defines it similarly: "A supply of electric current laid on in a building or room." Shorter Oxford English Dictionary 807 (6th ed. 2007). And a dictionary published around the time the current theft-by-fraud statute was enacted defined "electricity" as an "electric current" with examples of its use as "to install electricity; a machine run by electricity." The Random House Dictionary of the English Language 459 (1966). Coursing through these definitions is the notion that the word "electricity," as it is used in its everyday parlance, means something that provides power.

¶26 A straightforward reading of this statute combined with the use of dictionaries unequivocally supports the State's view that Steffes stole electricity from AT&T. To surmount this textual and lexicographical hurdle, Steffes describes a parade of horribles that will supposedly be unleashed if we uphold his conviction under Wis. Stat. § 943.20(1)(d). For example, Steffes claims that the failure to pay a dental or barber bill could result in prosecution for theft by fraud because dentists

17

and barbers use electricity when cleaning teeth and cutting hair. The difference, however, between not paying a dentist's or barber's bill and defrauding a phone company is that the dentist and barber do not <u>own</u> the electricity they use to provide services to customers, but rather pay a utility company to heat and light their offices. AT&T, by contrast, must buy AC power, turn it into DC power, and store it in batteries at one of its networks. The electricity used by AT&T is thus its "property" for purposes of the theft-by-fraud statute. Given this fundamental difference, we do not share Steffes's prosecutorial slippery slope concerns. <u>Cf.</u> Robert H. Bork, <u>The Tempting of America</u> 169 (1990) ("Judges and lawyers live on the slippery slope of analogies; they are not supposed to ski it to the bottom.").

¶27 What is more, this court does not issue advisory opinions on how a statute could be interpreted to different factual scenarios in future cases. <u>See</u> <u>Grotenrath v. Grotenrath</u>, 215 Wis. 381, 384, 254 N.W. 631 (1934) ("[C]ourts will not ordinarily render advisory opinions where the questions propounded have not arisen and may never arise."). Rather, it is our job to adjudicate the dispute in front of us. It is thus not necessary for us to resolve the hypotheticals laid out by Steffes. <u>See</u> <u>Gortmaker v. Seaton</u>, 450 P.2d 547, 548 (Or. 1969) (en banc) ("It is fundamental to appellate jurisprudence that courts do not sit 'to decide abstract, hypothetical, or contingent questions . . . .'") (citation omitted).

18

¶28 An issue raised at oral argument——but not briefed by Steffes——is that Steffes's conduct fell under the "theft of telecommunications service" statute, Wis. Stat. § 943.45. Because the parties did not address this question, we will not answer whether Steffes could be charged under any of the provisions in § 943.45(1). See State v. Pettit, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (noting that an appellate court may decline to address issues that are not briefed); see also State v. Johnson, 153 Wis. 2d 121, 124, 449 N.W.2d 845 (1990) (declining to address an issue not briefed). We do, however, pause to note that whether Steffes could have been charged with a different crime for the same conduct is not determinative of whether Steffes's conviction for theft by fraud was valid.

¶29 That a prosecutor has discretion in deciding what charges to bring is codified in this state's law: "[I]f an act forms the basis for a crime punishable under more than one statutory provision, prosecution may proceed under any or all such provisions." Wis. Stat. § 939.65. As we have said, "This section gives a green light to multiple charges, which may result in multiple convictions, under different statutory provisions." State v. Davison, 2003 WI 89, ¶51, 263 Wis. 2d 145, 666 N.W.2d 1 (emphasis removed). It is entirely permissible for a prosecutor to base a charging decision upon the penalty scheme set by the legislature for each potential crime. Cf. United States v. Batchelder, 442 U.S. 114, 125

19

(1979) ("The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause."). As long as a charging decision is not based on an arbitrary or discriminatory classification such as race or religion, prosecutors have broad discretion in deciding what charges to bring. State v. Ploeckelman, 2007 WI App 31, ¶13, 299 Wis. 2d 251, 729 N.W.2d 784. The ultimate question is whether the state can prove all the elements of the alleged offense.

¶30 The elements of theft by fraud are: (1) the victim was the owner of property; (2) the defendant made a false representation to the owner; (3) the defendant knew the representation was false; (4) the defendant made the representation with intent to deceive and to defraud the owner; (5) the defendant obtained title to the property by the false representation; (6) the owner was deceived or misled by the representation; (7) the owner parted with title to the property in reliance on the false representation and was thus defrauded. Wis JI——Criminal 1453A. AT&T purchased AC power from a utility company and turned it into DC power by storing it in batteries. It was thus the owner of the electricity, satisfying element number one. As for the next three elements, we explained in the previous section that members of the conspiracy knowingly made false representations to AT&T with the intent of deceiving and defrauding the company. The fifth element is satisfied by the

20

fact that Steffes made hundreds of phone calls over AT&T's phone lines.[9] Finally, on the last two elements, AT&T was deceived into parting with its property in that it relied on the fictitious business names and stolen personal identifying information that Steffes and his co-conspirators provided as a means of fraudulently setting up phone numbers. As all the

---

[9] The phrase "[o]btains title to property" found in Wis. Stat. § 943.20(1)(d) seems to indicate that a defendant must acquire actual legal title to an item to be convicted of theft by fraud. The court of appeals addressed this issue in State v. Meado, 163 Wis. 2d 789, 793, 472 N.W.2d 567 (Ct. App. 1991), when it was presented with the question of whether a defendant who fraudulently obtained a lease——but not full title——to a van could be prosecuted under the statute. The answer was yes, because if the court "adopted [Meado's] argument that actual title is required to pass, an actor would have to obtain the legal document that is evidence of the title before the actor could be charged with violating" § 943.20(1)(d). Meado, 163 Wis. 2d at 798 (emphasis in original). This reading of the statute "would reward the industrious and designing thief who, having perpetrated the proper fraud by making false representations, could escape criminal liability as long as the official title remained with the owner as security." Id. The Wisconsin Criminal Jury Instructions Committee agrees with this view as well. Wis JI——Criminal 1453A, Comment 5.

We concur with the Meado court's interpretation of Wis. Stat. § 943.20(1)(d). Very few pieces of property actually have a legal title with a name on it. If the state had to show that a defendant was a title holder of the property he stole, theft by fraud would be impossible to prosecute for a wide swath of cases. Furthermore, it would be absurd if fraudulently obtaining title to a home or vehicle were criminalized but the exact same conduct were legal so long as the perpetrator were only leasing. Cf. Kalal v. Circuit Court for Dane Cnty., 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110 (observing that statutes are interpreted to avoid absurd or unreasonable results). For these reasons, we hold that 943.20(1)(d) only requires the prosecution to show that the defendant obtained the property.

elements of theft by fraud were met in this case, it is irrelevant whether Steffes could have been prosecuted under a different statute.

## V. CONCLUSION

¶31 Two issues are presented in this case. The first is whether submitting fictitious business names and stolen personal identifying information is a "false representation" under Wis. Stat. § 943.20(1)(d). Steffes alleges that such conduct is not a false representation because the statute requires that the actor make an express promise to pay. The second issue is whether the applied electricity that AT&T uses to power its network is included within the definition of "property" found in § 943.20(2)(b). Steffes argues that his conviction cannot be sustained because the evidence at trial showed that he stole telephone <u>services</u> and not <u>property</u>.

¶32 On the first issue we hold that Steffes made "false representations" to AT&T. The theft-by-fraud statute says that "'[f]alse representation' <u>includes</u> a promise made with intent not to perform if it is part of a false and fraudulent scheme." Wis. Stat. § 943.20(1)(d) (emphasis added). Because the word "includes" is not restrictive, the statute clearly anticipates that other conduct aside from an express promise falls under the umbrella of a "false representation." The scope and history of the theft-by-fraud statute make plain that providing fictitious business names and stolen personal identifying information to a

22

phone company as a way of avoiding payment falls within the meaning of "false representation."

¶33  As to the second issue, "property" under the theft-by-fraud statute is defined as "all forms of tangible property, whether real or personal, without limitation <u>including electricity</u>, gas and documents which represent or embody a chose in action or other intangible rights."  Wis. Stat. § 943.20(2)(b) (emphasis added).  Relying on the plain language of the statute in conjunction with commonly used dictionaries, we conclude that Steffes stole electricity from AT&T.  AT&T purchases and stores electricity to power its network.  When consumers make phone calls, AT&T must buy more electricity.  The conspiracy perpetrated against AT&T therefore deprived the company of its property.  We affirm the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶34 SHIRLEY S. ABRAHAMSON, C.J. *(dissenting)*. In common parlance, Matthew Steffes, the defendant, and his co-conspirators set up a complicated scheme to steal from the telephone company. They intended to, and did, bilk the telephone company of what the telephone company sells——telephone services.

¶35 The defendant is not, however, guilty of a crime unless the State can prove beyond a reasonable doubt that he violated the terms of a specific statute. Why? Because there are no common law crimes in Wisconsin.[1] All crimes are statutorily defined.

¶36 The defendant in the present case was charged with, and found guilty of, violating Wis. Stat. §§ 943.20(1)(d)[2] and 943.20(3)(c),[3] a class G felony. These statutes criminalize

---

[1] Wis. Stat. § 939.10. See also State v. Genova, 77 Wis. 2d 141, 145-46, 252 N.W.2d 380 (1977).

[2] Wisconsin Stat. § 943.20(1)(d) reads:

(1) Acts. Whoever does any of the following may be penalized as provided in sub. (3):

. . . .

(d) Obtains title to property of another person by intentionally deceiving the person with a false representation which is known to be false, made with intent to defraud, and which does defraud the person to whom it is made. "False representation" includes a promise made with intent not to perform it if it is a part of a false and fraudulent scheme.

[3] Wisconsin Stat. § 943.20(3)(c) provides:

(3) Penalties. Whoever violates sub. (1):

1

fraudulently obtaining the <u>property</u> of another with a <u>value in excess of $10,000</u>.

¶37 The question of law presented in the instant case is, as the majority opinion states at ¶15: "[W]hether the applied electricity that AT&T uses to power its network is included in the definition of 'property' found in § 943.20(2)(bparlan)." As the majority opinion explains at ¶¶9-10, the telephone company uses electricity to power the transmission of telephone calls.[4]

¶38 Electricity is specifically enumerated as "property" subject to the statute.[5] Wisconsin Stat. § 943.20(2)(b) defines the word "property" for purposes of the statute as follows: "'Property' means all forms of tangible property, whether real or personal, without limitation including electricity, gas and documents which represent or embody a chose in action or other intangible rights."[6]

¶39 Services, including telephone services, are not included within the statutory definition of property.[7]

---

. . . .

(c) If the value of the property exceeds $10,000, is guilty of a Class G felony.

[4] I agree with the majority opinion that the defendant engaged in false representation to defraud the telephone company.

[5] The jury was instructed that under Wisconsin law the term "property" includes electricity.

[6] Wis. Stat. § 943.20(2)(b).

[7] Theft of services cannot be prosecuted under Wis. Stat. § 943.20 of the Criminal Code. <u>See</u> William A. Platz, <u>The Criminal Code</u>, 1956 Wis. L. Rev. 350.

2

¶40 I write on two issues of law presented: (1) whether stealing telephone services from the telephone company constitutes stealing electricity under the statute at issue; and (2) if so, whether the value of the telephone services equals the value of the electricity stolen under the statute at issue.

_____

Early drafts of the statute in 1950 (Bill No. 784, S.) and 1953 (Bill No. 100, A.,), included explicit language listing services as property subject to theft under § 943.20. See Drafting Records for 1950 Bill No. 784, S. and 1953 Bill No. 100, A., on file at Wis. Legislative Reference Bureau, Madison, Wis.

The legislature later removed all language regarding services and intangible property from the statute it eventually enacted in 1955. Ch. 696, Laws of 1955, § 943.20(2)(a) (eff. July 1, 1956).

In 1960, Gordon B. Baldwin, Professor of Law and assistant dean at the University of Wisconsin Law School, summarized the comprehensive changes to the Criminal Code regarding misappropriation. He explained that the definition of property in § 943.20 "does not reach the deceiver who takes labor and services from another without any intention of paying." Professor Baldwin advised that "[i]f criminal sanctions are needed to protect [service providers] specific statutes must be enacted."

Professor Baldwin wrote:

The comprehensive definition of property in the Criminal Code does not, however, reach all persons who intend a misappropriation. It does not reach the deceiver who takes labor and services from another without any intention of paying. The doctor, architect, engineer and garagemen [sic] may be victimized and deserves protection, but the property definitions are not comprehensive enough to cover these misappropriations of services and time. If criminal sanctions are needed to protect them specific statutes must be enacted (emphasis in original).

Gordon B. Baldwin, Criminal Misappropriation in Wisconsin – Part I, 44 Marq. L. Rev. 253, 262 (Winter 1960-61).

¶41 The State chose, as is its prerogative, to charge the defendant with violation of the felony statute.[8] I do not agree with the State or the majority opinion that stealing telephone services that apply electricity is stealing electricity within the meaning of Wis. Stat. § 943.20. Even if stealing the telephone services can be shoehorned into the statutory concept of stealing electricity, I do not agree with the majority that, as a matter of law or fact, the value of electricity stolen is the same as the market value or replacement value of the telephone services stolen. I therefore dissent.

I

¶42 I conclude as a matter of statutory interpretation that the defendant did not steal electricity from the telephone company under the statute at issue.

¶43 Electricity powers our 21st Century world. We all purchase electricity or use electricity purchased by others to power our lives. The telephone company purchases electricity and provides services that are powered by electricity.

¶44 The majority opinion defines electricity: "[I]n its everyday parlance [electricity] means something that provides power" and that "[a] straightforward reading of this statute combined with the use of dictionaries unequivocally supports the

---

[8] The State might have charged and proved a violation of Wis. Stat. § 943.45, entitled "Theft of Telecommunications Service." The penalty is, at most, a Class B misdemeanor.

The State in future similar cases might use Wis. Stat. § 943.50, creating a felony for the theft of services valued at more than $500. This statute was enacted in 2011, after the defendant's conduct and the trial in the present case occurred.

4

State's view that Steffes stole electricity from AT&T." Majority op., ¶¶25-26.

¶45 The majority opinion seems to rely on two theories to support its interpretation of the statutory word "electricity." First, it asserts that "applied electricity" is included within the statutory word "electricity." Second, it asserts that the telephone company differs from the typical user of electricity or service provider that powers its services with electricity. Why? Because the telephone company, unlike other users of electricity or service providers, <u>owns</u> the electricity. Majority op., ¶¶26, 30.

¶46 The majority opinion, the State, and the court of appeals interpret the word "electricity" in the statute to include "applied electricity."

¶47 The majority opinion defines the word "electricity," as we stated above, but does not define the phrase "applied electricity." The phrase "applied electricity" does not appear in dictionaries or in glossaries discussing electricity.[9] So what is the meaning of the phrase?

¶48 At trial, the State presented testimony that telephone services are included in the definition of "property" because telephone service uses an "applied form of electricity." Robert Lindsley, an electrical engineer and manager for the telephone

_____

[9] <u>See, e.g.,</u> 8 <u>Cyclopedia of Applied Electricity</u> 483 (1921) (glossary of electrical terms); <u>see also</u> Clair A. Bayne, <u>Applied Electricity & Electronics</u> 656-70 (2000) (glossary of important terms).

company offered his expert opinion that "when you, you know, use your phone, you are using an applied form of electricity."[10]

¶49 In its brief to the court of appeals, the State argued that "[t]he 'property' obtained by the installation and use of the fraud [sic] telephone lines by false representation were [sic] valuable telephone services which involve an 'applied form' of electricity and, as such, is 'property' within the scope of the statute. . . . Those calls simply could not be completed without electricity (unless the co-conspirators used tin cans and miles of string to transmit voice impulses). Electricity is an essential component of telephone service . . . ."[11]

¶50 Interpreting the statutory word "electricity" appearing in Wis. Stat. § 943.20(2)(b), the court of appeals concluded as a matter of law that "electricity" as used in the statute includes "applied electricity," that is, that the

---

[10] Testimony of Robert Lindsley, in part:

When the telephone company bills a telecommunications network, it also bills a power network to support that telecommunications network. That power network splices electricity to the telephone network, and without that electricity, the telephone network would not be able to——to cause communications to occur over that network. Basically, when you, you know, use your phone, you are using an applied form of electricity.

When Robert Lindsley was asked whether he knew the telephone company's cost to power the phone system, he testified that he did not.

[11] State's court of appeals brief at 16.

6

statute includes electricity used to transmit the human voice via telephone lines.[12]

¶51 In its brief before this court, the State argues that "property" under Wis. Stat. § 943.20(2)(b) includes electricity in its applied form; that "[t]he electricity and the telephone system to which it was applied were inextricably linked," and that "[e]lectricity is an essential component of telephone service . . . ."[13]

¶52 Thus, the phrase "applied electricity" simply refers to the application of electricity in some manner. The phrase is used to mean how and when electricity is used to power a particular product or service. The phrase "applied electricity," as used in the majority opinion, means the telephone company applies electricity in the delivery of telephone services. More broadly, "applied electricity" means any application of electricity.

¶53 This use of the phrase "applied electricity" is the ordinary use of the phrase. Accordingly, the Cyclopedia of Applied Electricity describes itself as "a complete and practical working treatise on the generation and application of electric power."[14] According to the Cyclopedia: "The

---

[12] State v. Steffes, 2012 WI App 47, ¶¶23-24, 340 Wis. 2d 576, 812 N.W.2d 529.

[13] State's Brief at 28.

[14] 1 Cyclopedia of Applied Electricity 7 (1921). Still, the term "applied electricity" is not found in the Table of Contents or the Index.

applications of the electric current are numberless and are to be found in every home. . . . Think again of the telephone, the wire and wireless telegraphs, and the thousands of other application of the electric spark, and electric energy which contribute to our daily comfort."[15]

¶54 Thus, stealing "applied electricity" means in the present case, according to the majority opinion, stealing the electricity used to power the telephone services. Majority op., ¶5.

¶55 If the criminal statute at issue includes electricity used to power telephone services as property, then the majority opinion has, in effect, rewritten the statute to include numerous services that are powered by electricity.

¶56 The State attempts to avoid this result by distinguishing telephone services from other "services [that]

---

The phrase "applied electricity" is most often used as a textbook title, in a similar manner to the phrase "Applied Mathematics."

See also Principles of Electricity Applied to Telephone and Telegraph Work (1961) (The title page describes the text as "[a] Training Course Text Prepared for Employees of the Long Lines Department, American Telephone and Telegraph Company." The Preface explains that this edition of the text "has required the introduction of certain basic concepts and principles not dealt with in earlier editions, as well as numerous examples to illustrate their applications in practice."); Clair A. Bayne, Applied Electricity and Electronics (2000) (The phrase "applied electricity" is in the title of the text, but is not found in the Table of Contents, the Index, or the Glossary of Important Terms.).

[15] 1 Cyclopedia of Applied Electricity 8 (1921). For a discussion of electricity applied to the telephone, see 8 Cyclopedia of Applied Electricity 11-90 (1921).

involve the use of electricity (i.e., legal advice over a telephone or the barber's use of electric hair clippers)." From the State's vantage point, electricity is incidental to numerous services but, in contrast, integral to the telephone. Employees, skills, time, machinery, and labor are incidental to telephone services but, in contrast, according to the State, integral to other services that use electricity. The State's brief explains the differences among service providers that use applied electricity as follows:

> The obvious difference is that the telephone lines cannot function, and so the service cannot be provided, without an enabling electrical system: electricity is essential to the service. A telephone system cannot exist without it. The customer who purchases access to a phone line purchases the electricity that powers it. Legal services and a haircut can, theoretically, be provided without using electricity (a face-to-face meeting with a lawyer; a barber's scissors or straight razor). The electricity used in connection with those services is only incidental to the service itself. It is the value of the lawyer's skill and time, and the barber's skill and labor, that is lost when those services are fraudulently obtained by the lawyer's client or the barber's customer. The telephone company loses the value of the applied form of electricity when its services are fraudulently obtained; the value of the telephone company's spent employee skills, time and labor are only incidental to that service.[16]

¶57 This argument is unpersuasive, and the majority opinion rightfully refuses to adopt it.

¶58 Service providers other than the telephone company require electricity to operate. For example, the dentist uses electricity to power the lights, the dental chair, the drill,

---

[16] State's Brief at 32 n.15 (emphasis in original).

the electric toothbrush, the suction apparatus, the ultrasonic sterilizer, the sealant gun, the x-ray machine, the security system, and computers. Even the old-school barber, with only her scissors and straight razor, needs lights to see what she is doing. As I recently discovered, when the electricity is shut off for a few hours, the barber closes up shop.

¶59 Without electricity, neither the telephone company nor the dentist nor the barber can operate. Electricity is essential and integral to telephone and dental and barbering services and telephone and dental and barbering services all also require human skills, time, labor, and equipment.

¶60 In lieu of the State's argument that "electricity is integral to telephone services," the majority opinion distinguishes telephone services using "applied electricity" from other services using "applied electricity" based on the notion that the telephone company owns the electricity that powers the telephone services. Robert Lindsley explained that the telephone company purchases AC power from the commercial utility, converts the electricity into DC power, and stores that energy in batteries so that in the event of a power outage, the telephone company can use the energy from the batteries to power the telephone system.[17]

---

[17] Testimony from AT&T expert Robert Lindsley:

There are two different forms of power. There is AC power, which is what you would get out of your AC outlet at your home, and you are getting that from the commercial utility. And then there is DC power. The difference between AC and DC power is DC power, which is direct current power, can be stored in batteries. AC power cannot be stored in batteries.

¶61 The majority opinion promotes the "ownership" distinction as follows:

> The difference, however, between not paying a dentist's or barber's bill and defrauding a phone company is that the dentist or barber do not <u>own</u> the electricity they use to provide services to customers, but rather pay a utility company to heat and light their offices. AT&T, by contrast, must buy AC power, turn it into DC power, and store it in batteries at one of its networks. The electricity used by AT&T is thus its "property" for purposes of the theft-by-fraud statute.[18]

¶62 The majority opinion's theory of the distinctiveness of electricity that powers telephone service based on the telephone company's <u>ownership</u> of electricity is not supported by fact or law.

¶63 First, it seems to me that the majority opinion may be misreading the record regarding the concept of and importance of the telephone company's storage and "ownership" of electricity. Very little testimony discusses this issue. No one focused on this topic at trial. Yet a plain reading of Robert Lindsley's testimony seems to indicate that the telephone company only converts and stores electricity for use during a power outage and may simply transmit the electricity it normally receives.

---

> So the telephone company actually buys AC power from the commercial utility, rectifies that DC——or excuse me. The AC power into a DC form, stores that energy in batteries so that if we lose commercial power to our central office, your phone continues to work.

[18] Majority op., ¶26 (emphasis in original).

¶64 Furthermore, other service providers may also store (and thus "own") electricity for later use.[19] A dentist purchases electricity to charge the laptop, cell phone, cordless phone, portable x-ray machine, and other portable electronic devices. The dentist stores the electricity in the devices' batteries and then uses the electricity later to perform a service.[20]

---

[19] The majority opinion attempts to distinguish the telephone company from other service providers and yet asserts at the same time that comparing service providers creates a slippery slope and unnecessary hypotheticals. Majority op., ¶¶26-27.

Looking at how other service providers use electricity and at whether theft of their services can be prosecuted under the majority opinion's interpretation of the statute at issue is helpful to ensure that the statute is being interpreted correctly and that it will be applied consistently in the future to similar cases. Were a person to fraudulently acquire cable television or internet service or a ticket on an electric train, could that person be successfully prosecuted for stealing electricity under the majority opinion's interpretation of the statute at issue in the present case?

[20] See John Bird, Electrical and Electronic Principles and Technology 28-29 (3d ed. 2007):

The battery is now over 200 years old and batteries are found almost everywhere in consumer and industrial products. Some practical examples where batteries are used include:

In laptops, in cameras, in mobile phones, in cars, in watches and clocks, for security equipment, in electronic meters, for smoke alarms, for meters used to read gas, water and electricity consumption at home, to power a camera for an endoscope looking internally at the body, and for transponders used for toll collection on highways throughout the world.

¶65 Second, as a matter of law, the majority opinion's reliance on the telephone company's "ownership of electricity" as the determinative factor under the statute at issue is erroneous. This ownership distinction is contrary to law and the purpose of the theft statute.[21]

¶66 The purpose of the theft statutes is to prevent the taking of property without the consent of the owner or the person who has constructive or actual possession.[22]

¶67 Property may be stolen from anyone who has the right to possess and use a thing to the exclusion of others.[23] Possession and control over the use of property is all that is required in order for it to be stolen. Electricity may be diverted (stolen) from one that takes and stores electricity or one that simply pays to possess and use electricity.

---

[21] Mitchell v. State, 84 Wis. 2d 325, 339, 267 N.W.2d 349 (1978) (the offenses involving personal property contained in Chapter 943 consistently make possession of the property, not ownership, the key factor).

See also Wis. Stat. § 943.32(3) (for purposes of the robbery statute, "owner" means a person in possession of property whether the person's possession is lawful or unlawful).

See also Wis. Stat. § 971.33, Possession of property (in the prosecution of a crime committed by stealing, damaging, or fraudulently receiving or concealing personal property, it is sufficient if it is proved that at the time the crime was committed either the actual or constructive possession or the general or special property in any part of such property was in the person alleged to be the owner thereof).

[22] See generally 3 Wayne R. LaFave, Substantive Criminal Law § 19.2(a) (2d ed. 2003).

[23] See Mitchell v. State, 84 Wis. 2d 325, 339, 267 N.W.2d 349 (1978).

13

¶68 The two dead giveaways for me that the State was prosecuting the defendant for theft of telephone services, not for the theft of electricity, were the charging documents and the State's argument that the value of the telephone services stolen equals the value of the electricity stolen.[24]

¶69 The criminal complaint and information do not mention electricity. These documents simply allege that the defendant stole both services and property.

¶70 The only reference in the complaint to the stolen property and its value is in Section 1 of the complaint, entitled Summary of Allegations, which explains, "All tolled [sic], SBC representatives calculate that this fraud group bilked the Phone Company out of about $40,000 in phone service fees."

¶71 The First Amended Information alleges that the defendant conspired to "obtain[] title to the property of [the telephone company], having a value exceeding $10,000 . . . [by making] a false promise to pay for telephone service

---

[24] According to testimony at trial, telephone service fees paid by telephone customers not only pay for the electricity used to power the system, but also pay for the transmission wires, cables, offices, employees, and other machines and equipment.

14

accounts . . . ." The information does not specify the property that was the object of the conspiracy.[25]

_____

[25] The defendant was initially charged in 2004, pled no contest, was sentenced, and then was permitted to withdraw his no-contest plea in 2009. After the plea was withdrawn, a Third Amended Information was filed, which restated charges filed years earlier in the First Amended Information. The Third Amended Information is not in the record, but the First Amended Information is in the record, and represents the charges brought at trial.

First Amended Information:

COUNT 01: CONSPIRACY TO MISAPPROPRIATE PERSONAL IDENTIFYING INFORMATION, HABITUAL CRIMINALITY (As to Defendants Matthew Steffes and Joshua Howard)

Between about July 1, 2002 and December 1, 2002, at various locations within the County of Milwaukee, with intent that a crime be committed, did combine with another for the purpose of committing a crime, viz:

**The crime of Identity Theft . . .**

COUNT 02: CONSPIRACY TO COMMIT THEFT BY FRAUD (VALUE > $10,000), HABITUAL CRIMINALITY (As to Defendants Matthew Steffes and Joshua Howard)

Between about July 1, 2002 and July 1, 2003, at various locations within the County of Milwaukee, with intent that a crime be committed, did combine with another for the purpose of committing a crime, viz.:

**The crime of Theft by Fraud,** whereby the conspirators did combine for the purpose of obtaining title to the property of SBC, having a value exceeding $10,000, by intentionally deceiving SBC with a false representation known by the conspirators to be false, viz. a false promise to pay for telephone service accounts created in the name of Nick Steffes, which representation made with intent to defraud and which did defraud SBC, and furthermore one or more co-conspirators did an act to effect the conspiracy's object contrary to Wisconsin Statutes section 943.20(1)(d) & (3)(c) and 939.31 and 939.62 (emphasis added).

15

¶72 The State not only made no effort to explain in the charging documents that the defendant stole electricity, but also made no effort at trial to quantify or qualify the amount or type of electricity stolen, or its value at the time it was stolen.

¶73 The State has the burden to prove what property was stolen——how much property, what kind of property, and the value of the property.

¶74 The State did not proffer any information at trial to quantify, qualify, or value the electricity that was allegedly stolen——how much electricity, what kind of electricity, or the value of the electricity stolen. Rather, the State proved the number of telephone minutes used and the value of the telephone services.

---

COUNT 03: CONSPIRACY TO COMMIT THEFT BY FRAUD (VALUE > $10,000), HABITUAL CRIMINALITY (As to Defendants Matthew Steffes and Joshua Howard)

Between about July 1, 2002 and July 1, 2003, at various locations within the County of Milwaukee, with intent that a crime be committed, did combine with another for the purpose of committing a crime, viz.:

**The crime of Theft by Fraud,** whereby the conspirators did combine for the purpose of obtaining title to the property of SBC, having a value exceeding $10,000, by intentionally deceiving SBC with a false representation known by the conspirators to be false, viz. a false promise to pay for telephone service accounts created in the name of Jamie Douyette, which representation was made with intent to defraud and which did defraud SBC, and furthermore one or more co-conspirators did an act to effect the conspiracy's object contrary to Wisconsin Statutes section 943.20(1)(d) & (3)(c) and 939.31 and 939.62 (emphasis added).

16

¶75 The best the majority opinion can put forth (and it is not good enough to convince me) is to explain that "AT&T purchases and stores electricity to power its network. When consumers make phone calls, AT&T must buy more electricity. The conspiracy perpetrated against AT&T therefore deprived the company of its property." Majority op., ¶5.

¶76 For the reasons set forth, I conclude that the defendant's bilking the telephone company was theft of telephone services, not theft of electricity under the statute. As Assistant Attorney General William Platz and Professor Gordon Baldwin both explained more than a half century ago, theft of services is not covered by Wis. Stat. § 943.20. The simple fact that electricity is used to power telephone service does not morph a theft of these services into a theft of electricity.

## II

¶77 Even if stealing telephone services would constitute stealing electricity under the statute at issue, and it does not, the value of the electricity stolen is not, as a matter of law or fact, equal to the value of the telephone services. The State and the majority opinion can add whatever adjectives they like before the term "electricity," but to convict an individual for a Class G felony under § 943.20, the State must prove that the individual in fact stole a quantifiable and valuable amount of electricity in excess of $10,000.

¶78 The value of the electricity stolen is an important factor because the penalty for theft ranges from a misdemeanor

17

through a Class G felony depending on the value of the property stolen.[26]

¶79 Value is statutorily defined as "the market value at the time of the theft or the cost to the victim of replacing the property within a reasonable time after the theft, whichever is less."[27]

¶80 Although the fair market value (or replacement value) of the stolen property is not an element of theft, when a criminal statute prescribes a penalty based on the value of the property, the fact finder (here the jury) determines the value of the property stolen and the jury's determination must be supported by the evidence. The sentence for a theft felony cannot stand when there is no factual basis for the value of the stolen property.[28]

¶81 The burden is on the State to prove the value of the stolen electricity. The majority erroneously flips the burden

---

[26] In Sartin v. State, this court explained:

> While . . . the value of the property stolen is not an element of the crime of theft, nevertheless value is of the utmost importance in determining the applicable penalty upon conviction.

Sartin v. State, 44 Wis. 2d 138, 148, 170 N.W.2d 727 (1969). See also White v. State, 85 Wis. 2d 485, 490, 492-93, 271 N.W.2d 97 (1978).

[27] Wis. Stat. § 943.20(2)(d).

[28] White v. State, 85 Wis. 2d 485, 490, 492-93, 271 N.W.2d 97 (1978) (a factual basis must be established for value; "Value must be determined before an appropriate penalty can be imposed . . . ."); Sartin v. State, 44 Wis. 2d 138, 151, 170 N.W.2d 727 (1969).

to the defendant to prove the quantity and value of electricity used to make each call. Majority op., ¶24 n.8.

¶82 The State proved only the "fair market value" of the telephone calls, not the "fair market value" of the electricity stolen and not the "replacement cost" of the electricity stolen. The State was content with not offering the quantity and value of the stolen electricity even though at trial AT&T's engineer, Robert Lindsley, testified that it would be possible to determine how much electricity was used to power each of the defendant's phone calls, but "it would be a very labor intensive process."

¶83 Moreover, according to the testimony, the cost of the electricity used to provide telephone service does not equal the amount the telephone company charges for telephone service. Additional costs beyond the cost of electricity factor into the fees the telephone company charges for telephone service. Testimony at trial was that the telephone service fees paid by consumers not only pay for the electricity used to power the system, but also pay for the transmission wires, cables, offices, employees, and other machines and equipment.

¶84 Thus, the fair market value of the stolen telephone service that the State offered at trial is not equal to the fair market value of the electricity stolen. Accordingly, as a matter of law or fact, the State did not prove the value of the electricity stolen.

¶85 The majority opinion follows the lead of the court of appeals, equating "applied electricity" to the entire telephone

19

service as follows: "[T]he market value to the telephone company of the services [fraudulently obtained] is the correct measure of the value of the stolen property in this case. . . . The undisputed evidence is that the phone company lost over $26,000 in billable services——i.e. applied electricity . . . ."[29]

¶86 The State did not prove the value of the electricity stolen. Even if the statute is interpreted to mean the applied electricity in the present case, and I do not so interpret the statute, the State did not prove that the value of the stolen property exceeds $2,500.[30] Under these circumstances the felony conviction must be vacated, a conviction of a Class A misdemeanor must be entered, and the cause must be remanded for resentencing.[31]

¶87 For the reasons set forth, I dissent.

¶88 I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.

---

[29] State v. Steffes, 2012 WI App 47, ¶¶23-24, 340 Wis. 2d 576, 812 N.W.2d 529.

[30] The minimum value of property stolen required for theft to be classified as a felony is $2,500. Wis. Stat. § 943.20(3)(a) If the value of the property does not exceed $2,500, [whoever violates sub. 1] is guilty of a Class A misdemeanor.

[31] White v. State, 85 Wis. 2d 485, 493, 271 N.W.2d 97 (1978).